The State of Rhode Island and Providence Plantations, Complainant, vs. The State of Massachusetts, Defendant.*

By a rule of the Supreme Court, the practice of the English Courts of Chancery is the practice in the Courts of Equity of the United States. In England the party who puts in a plea, which is the subject of discussion, has the right to begin and conclude the argument. The same rule should prevail in the Courts of the United States, in Chancery cases.

In a case in which two sovereign states of the United States are litigating a question of boundary between them, in the Supreme Court of the United States, the Court have decided, that the rules and practice of the Court of Chancery should, substantially, govern in conducting the suit to a final issue. 12 Peters, 735—739. The Court, on re-examining the subject, are fully satisfied with the decision.

In a controversy where two sovereign states are contesting the boundary between them, it is the duty of the Court to mould the rules of Chancery practice and pleading in such a manner as to bring the case to a final hearing on its merits. It is too important in its character, and the interests concerned too great, to be decided upon the mere technical principles of Chancery pleading.

In ordinary cases between individuals, the Court of Chancery has always exercised an equitable discretion in relation to its rules of pleading, whenever it has been found necessary to do so for the purposes of justice. In a case in which two sovereign states are contesting a question of boundary, the most liberal principles of practice and pleading ought, unquestionably, to be adopted, in order to enable both parties to present their respective claims in their full strength. If a plea put in by the defendant may in any degree embarrass the complainant in bringing out the proofs of his claim on which he relies, the case ought not to be disposed of on such an issue. Undoubtedly, the defendant must have the full benefit of the defence which the plea discloses, but, at the same time, the proceedings ought to be so ordered as to give the complainant a full hearing on the whole of his case.

According to the rules of pleading in the Chancery Courts, if the plea is unexceptionable in its form and character, the complainant must either set it down for argument, or he must reply to it, and put in issue the facts relied on in the plea. If he elects to proceed in the manner first mentioned, and sets down the plea for argument, he then admits the truth of all the facts stated in the plea, and merely denies their sufficiency in point of law to prevent the recovery. If, on the other hand, he replies to the plea, and denies the truth of the facts therein stated, he admits that if the particular facts stated in the plea are true, they are then sufficient in law to bar his recovery; and if they are proved to be true, the bill must be dismissed, without a reference to the equity arising from any other facts stated in the bill.

If a plea upon argument is ruled to be sufficient in law to bar the recovery of the complainant, the Court of Chancery would, according to its uniform practice, allow him to amend, and put in issue, by a proper replication, the truth of the facts stated in the plea. But in either case the controversy would turn altogether upon the facts stated in the plea, if the plea is permitted to stand. It is the strict and technical character of those rules of pleading, and the danger of injustice often arising from them, which has given rise to the equitable discretion always exercised by the Courts of Chancery in relation to pleas. In many cases, when they are not overruled, the Court will not permit them to have the full effect of a plea; and will, in some cases, leave to the defendant the benefit of it at the hearing: and, in others, will order it to stand for an answer, as, in the judgment of the Court, may best subserve the purposes of justice.

The state of Rhode Island, in a bill against the state of Massachusetts, for the settlement of the boundary between the states, had set forth certain facts on which she relied in support of her claim for the decision of the Supreme Court, that the boundary claimed by the state of Massachusetts was not the true line of division between the states, ac-

---

* Mr. Justice Story did not sit in this case.

[The State of Rhode Island *vs.* The State of Massachusetts.]

cording to their respective charters. To this bill, the state of Massachusetts put in a plea and answer; which the counsel for the state of Rhode Island deemed to be insufficient. On a question, whether the plea and answer were insufficient, the Court held; that as, if the Court proceeded to decide the case upon the plea, it must assume without any proof on either side, that the facts stated in the plea are correctly stated, and incorrectly set forth in the bill, then it would be deciding the case upon such an issue as would strike out the very gist of the complainant's case; and exclude the facts upon which the whole equity is founded, if the complainant has any. The Court held, that it would be unjust to the complainant not to give an opportunity of being heard according to the real state of the case, between the parties; and to shut out from consideration the many facts on which he relies to maintain his suit.

It is a general rule, that a plea ought not to contain more defences than one. Various facts can never be pleaded in one plea; unless they are all conducive to the single point on which the defendant means to rest his defence.

The plea of the state of Massachusetts, after setting forth various proceedings which preceded and followed the execution of certain agreements with Rhode Island, conducing to show the obligatory and conclusive effect of those agreements upon both states, as an accord and compromise of a disputed right; proceeded to aver that Massachusetts had occupied and exercised jurisdiction and sovereignty, according to the agreement, to this present time: and then sets up as a defence, that the state of Massachusetts had occupied and exercised jurisdiction over the territory from that time up to the present. The defendants then plead the agreements of 1710 and 1718, and unmolested possession from that time, in bar to the whole bill of the complainant. The Court held, that this plea is twofold: 1. An accord and compromise of a disputed right. 2. Prescription, or an unmolested possession from the time of the agreement. These two defences are entirely distinct and separate; and depend upon different principles. Here are two defences in the same plea, contrary to the established rules of pleading. The accord and compromise, and the title by prescription united in this plea, render it multifarious: and it ought to be overruled on this account.

THIS case was before the Court at January term, 1838. The state of Rhode Island, in 1832, had filed a bill against the state of Massachusetts, for the settlement of the boundary between the two states; to which bill Mr. Webster, at January term, 1834, appeared for the defendant; and on his motion, the cause was continued until the following term, when a plea and answer were filed by him, as the counsel for Massachusetts. Before January term, 1837, the state of Rhode Island filed a replication to the plea and answer of the defendant; at the same time giving notice of a motion to withdraw the same.

At January term, 1838, the counsel for Massachusetts moved to dismiss the bill filed by the state of Rhode Island, on the ground that the Court had no jurisdiction of the cause.

This motion was argued by Mr. Austin, the attorney general of Massachusetts, and by Mr. Webster, for Massachusetts; and by Mr. Hazard and Mr. Southard, for the state of Rhode Island: and was overruled. 12 Peters, 657.

Afterwards, at the same term, Mr. Webster, on behalf of the state of Massachusetts, as her attorney and counsel in Court, moved for leave to withdraw the plea filed in the case on the part of Massachusetts; and also the appearance which had been entered for the state. Mr. Hazard moved for leave to withdraw the general replication to the plea of the defendant in bar, and to amend the original bill.

The Court, after argument, ordered, that if the counsel on behalf of Massachusetts shall elect to withdraw the appearance before entered, that leave be given for the same; and the state of Rhode Island may proceed ex parte. But, if the appearance be not withdrawn, that then, as no testimony has been taken, the parties be allowed to withdraw or amend the pleadings under such order as the Court may hereafter make. 12 Peters, 756.

At January term, 1839, Mr. Southard, on behalf of the state of Rhode Island, stated, that the bill filed by the state had been amended; and moved that a rule be granted on the state of Massachusetts, to answer in a short time, so that the cause might be disposed of during the term.

The Court, the bill of the state of Rhode Island having been amended the second day of the term, ordered that the state of Massachusetts should be allowed until the first Monday in August 1839, to elect whether the state will withdraw its appearance, pursuant to the leave granted at January term, 1838; and if withdrawn within that time, the state of Rhode Island should be, thereupon, at liberty to proceed ex parte. If the appearance of the state of Massachusetts should not be withdrawn before the first Monday in August 1839, the state to answer the amended bill before the second day of January, 1840. 13 Peters, 23.

The amendments made by the complainants in the bill were, chiefly, the insertion, by reference to reports of the commissioners of the colony of Massachusetts to the government of Massachusetts, while a colony, on the 13th of April, 1750, and on the 21st of February, 1792, to the legislature of the state of Massachusetts, appointed by an act of the commonwealth of Massachusetts, passed on the 8th day of March, 1791, "for ascertaining the boundary line between this commonwealth and the state of Rhode Island."

The report of April 13th, 1750, states, that the commissioners on the part of the colony of Massachusetts met the gentlemen appointed on behalf of the colony of Rhode Island, on the 10th of April, 1750, "and spent part of that and the next succeeding day in debating on said affair with those gentlemen;" and produced the agreement of 1710, 1711. "Sundry plans, &c. were offered to run and review with them the said line, but they refused to go, or join us herein, but insisted on our going with them to a certain place on Charles river, in Wrentham, from which they a few months since measured three miles south, and then extended a west line with the variation west, to the west bounds of that colony, as they claim as the west bounds of that colony, as they informed us; which bounds they claim as their north bounds; and is about four or five miles northward from Woodward and Saffrey's station." The report also states, "that on the return of the commissioners to the place of meeting, the Rhode Island commissioners not having accompanied the Massachusetts commissioners to the station, they found them at the original place of meeting, who desired the commissioners would adjourn to a second meeting, which was assented to, and the meeting fixed at

the same place, in October following, in case their respective governments consented thereto."

The seccud report was made by " The commissioners on the part of Massachusetts, to the legislature of that state, Feb. 21, 1792."

It is stated to be a report " that the commissioners appointed by an act of the legislature of the commonwealth of Massachusetts, passed on the 8th day of March, 1791, for ascertaining the boundary line between this commonwealth and the state of Rhode Island, have carefully attended the services assigned them, and take leave to report their doings."

The report states, "that on the 15th of August, 1791, we, by agreement, met the commissioners from the state of Rhode Island, at Wrentham, in this commonwealth, and after exchanging the powers under which we severally acted, we proceeded to discuss the subject that gave rise to our appointments, in the course of which, it appeared that the state of Rhode Island, from their construction of this expression, ' three miles south of Charles river, or of any and every part thereof,' in the ancient charter of the colony of Massachusetts, and as the south bounds of the same, claim near three miles north upon this commonwealth, than the present line of jurisdiction between the two governments; the commissioners of the commonwealth, from the circumstance that the branch, now called Charles river, and from which the claim of the state of Rhode Island would run three miles south to ascertain the south boundary of the commonwealth, could not have been known by the name of Charles at the time of granting the Massachusetts charter in 1621; and from this line being ascertained and fixed at a different place by commissioners chosen by the colonies of Massachusetts and New Plymouth in 1667, at a time when the intentions of the grantor and grantees must have been known, are convinced that the claim of the state of Rhode Island is ill founded; but to complete, if possible, the intentions of our appointments, and that the disputes between the governments might be amicably adjusted, we united with the commissioners of the state of Rhode Island, in the agreement as in number one.

" In examining and comparing the charter of the two governments, granted by the successive kings of England, under which both claim, it appears that the first charter to the colony of Massachusetts was granted by King James the First, in 1621, and resigned a certain territory to that colony, bounded by an east and west line, which was to be three miles south of Charles river, or of any and every part thereof; the same expression is also used for limiting a part of the bounds of the old colony of Plymouth, and was probably copied from their charter into the Massachusetts, to prevent an interference of claims; the same line is adopted in the charter from King Charles the Second, to the colony of Rhode Island, granted in 1663, and is their northern boundary. The erection of a third government, referring to the same bounds, seems to have rendered it necessary for Plymouth and Massachusetts to ascertain their bounds; accordingly those two governments, in 1664, appointed commissioners

to survey the most southern branch of the Charles river, and to lay off from thence three miles due south as their boundary line by charter; this was accordingly done, and they fixed upon a large tree, then known and since noted by the name of the Angle tree, as the north line of Plymouth, and the south line of Massachusetts. The knowledge and name of the place is preserved, and the commonwealth, in order to perpetuate it, have erected in the place of the tree, the remains of which are now to be seen, an handsome stone monument, which bears the name of Angle tree, and is explained by suitable inscriptions on the different faces of it. This the commissioners apprehend to have been the true and original boundary, and is three miles south of the most southerly waters of Charles river. It does not appear that the colony of Rhode Island ever expressed any dissatisfaction respecting their northern boundary until 1716, or thereabouts, which finally ended in the appointment of commissioners by both governments in 1718, who fixed a new station about two miles north of the Angle tree, and which was called after the surveyors, 'Woodward and Saffrey's Station.' This place is well known, although no records of it have been preserved, or the proceedings of the commissioners ratified by either government; yet the line drawn from it has been practised upon as the line of jurisdiction between the governments from that to the present time. This commonwealth then lost two miles in width along the northern line of Rhode Island, and seems to have acquiesced in the agreement upon principles of generosity. The ancient charter of New Plymouth and Rhode Island were irregularly bounded on one another: the former, as was supposed, by the shores of the Narraganset bay, the latter by three miles east of those shores; this interference of boundary, however, appears not to have given any discontent, as the date of the charter of New Plymouth was prior to that of Rhode Island; and the peaceful jurisdiction to the shores of Narraganset bay, was enjoyed not only by the old colony of Plymouth, but by Massachusetts, (after these two colonies were united by the charter of 1691,) down to the year 1730, at which time the colony of Rhode Island passed an act claiming the jurisdiction of the territory on their eastern boundary, granted to them, by charter, in this act and in the subsequent dispute and determination of the subject, not a claim, nor the intimation of one, but that their northern boundary was satisfactory, as established in 1718. In 1740, the King of Great Britain, who was then the sovereign of these states, appointed commissioners to hear and determine the dispute then existing between the governments, who, after hearing the parties, came to the determination as in number two, by which the extent of Rhode Island charter was allowed, and the jurisdiction of Massachusetts cut off from the shores of Narraganset bay. This judgment, unexpected by either party, was disapproved of by both, and they accordingly appealed to the king in council, where, however, it was ratified in 1746. As soon as this information was received by the colony of Rhode Island, they proceeded to appoint their

commissioners, and assigned the time of meeting for them to begin running the lines that had thus been determined, and they gave information thereof to the governor of this their province; but the legislature not being convened until some time after the period affixed for the Rhode Island commissioners to begin the survey, they thought it unnecessary for them to join in the commission. These lines, we perambulated in company with the commissioners of the state of Rhode Island, and, excepting one or two stations between Providence and Bristol, which were well ascertained, we found that they had encroached upon this commonwealth from one-quarter to three-quarters of a mile in width. We were attended by suitable persons, approved by both parties, for making the necessary observations and surveys. Here, probably, all further dispute relative to boundary lines with the colony of Rhode Island would have forever ended, had it not have been for the rage of political parties at this time within that colony; one of which, to effect a decided majority, was extremely anxious for an extension of northern jurisdiction. Influenced by these motives, and perhaps in some measure by their late success, they, in 1740, brought forward a new claim for extending their northern boundary beyond the line established in 1718; and to support that claim, they appointed commissioners in 1750, to examine what is now called Charles river, and from the most southern part of the same, to survey off three miles as the boundary of Massachusetts, agreeably to their charter. A plan of this survey was laid before us, and copy of it herewith presented. We have inserted our own survey of what we conceive to be the most southern part of Charles river, as intended by the charter, above Whiting's pond, and the position of the Angle tree. It may not be unnecessary to observe, that at the southern head of what we call Charles river, is a place known by a large chesnut tree; thence the stream descends to Whiting's pond, where it forms a considerable lake, and afterwards resuming its proper shape, (and now known by the name of Mill river or brooke,) pursues its course in a northerly direction till it joins that stream which is known by the name of Charles river, the confluence of the two streams six miles more northerly than the chesnut tree at the southern head of Charles; after perambulating the bounds now practised upon, and ascertaining their deviations from the stations to which they ought to have been fixed, and learning the principles upon which Rhode Island supports her claims, and the extent of them, we adjourned to the 5th day of December last, then to meet at Providence, in the state of Rhode Island; at which time and place we met with the commissioners from Rhode Island, and after fully discussing the several claims, and endeavouring to conciliate the difference between the two states, agreeably to the powers of our commission, we were convinced that no agreement can be made at present with them, unless we yield a valuable territory, to which they have no claim, and which we hold not only by repeated charters, but by the agreement of the state of Rhode Island in 1718; and so far from its ap-

pearing that encroachments have been made by this commonwealth on that state, that the contrary is notoriously the fact."

The counsel of the state of Massachusetts, after January term, 1839, and in conformity with the order and leave of the Court then given, filed a plea and answer to the amended bill of the state of Rhode Island. The plea and answer were the same, in all important particulars, as that originally filed at January term, 1834. The plea and answer conclude,—"And the defendant saith that there is no other matter or thing in the complainant's said bill of complaint contained, material for this defendant to make answer unto, and to which said defendant has not already pleaded and answered as aforesaid; all which matters and things pleaded and answered, as aforesaid, the defendant is ready to verify and maintain as the Court shall order. Wherefore said defendant prays to be hence dismissed, with costs."

All the matters in the bill, material in this case, and in the plea and answer, with the exception of the amendments given on pages 213—215, ante, are stated fully in the report of the case in 12 Peters, 657; and in the opinion of the Court delivered at this term, by Mr. Chief Justice TANEY.

The case was before the Court, on the sufficiency of the plea and answer. It was argued by Mr. Hazard and Mr. Whipple, for the state of Rhode Island; and by Mr. Austin, attorney-general of Massachusetts, and Mr. Webster, for the defendant.

Before the argument was proceeded in, a question arose between the counsel in the case, on the right of the counsel for the complainants to begin and conclude the argument.

The Court held, that by a rule of the Court, the practice of the English Courts of Chancery is the practice in the Courts of Equity of the United States. On looking into the books of practice in the English Courts of Chancery, it appears that the party who puts in the plea which is the subject of discussion, has the right to begin and conclude the argument. The same rule should prevail in the Courts of the United States, in Chancery proceedings.

Mr. Austin for the state of Massachusetts.

The question before the Court is on the sufficiency of the plea in bar to the plaintiff's demand, both for discovery and relief. The plea is open to any just exception, either as to its form or substance; but as it purports to be an answer or bar to the plaintiff's complaint, its sufficiency must materially depend on the structure of the bill in which that complaint is set forth. Any answer is sufficient to a bill which is so framed as to require none. The respondent contends that this opens, substantially, the whole merits of the case. Bogardus vs. Trinity Church, 4 Paige, 178.

The sufficiency of the plea is very different from the truth of it. For the purpose of the present inquiry, all its allegations are to be taken to be true. If the plaintiff denies any of them, he has another

mode of proceeding: it is understood also, that all allegations made in the bill, and denied by the plea, are, for this hearing, to be taken according to the plea, and not according to the statement of them in the bill: and it is admitted, that whatever is stated in the bill, and not controverted by the plea, is in this stage of the cause to be taken as true.  If, under these circumstances, the plea leaves the plaintiff without a sufficient cause for discovery and relief, it has answered its office, and must be sustained.  The case seems to the respondent in no material degree to differ from a general demurrer to the bill; except only that the allegations of the plea control those of the bill, and are admitted to be true pro hac vice only.

Before the sufficiency of the plea can be ascertained, the matter to be answered must be examined and understood.  The bill sets forth the plaintiff's title.  It is of a form adopted, not very remotely, into the practice of Chancery; and requiring, or at least admitting, what the books call, without much propriety, an anomalous or irregular plea; thus applying terms to the plea, which in fact belong to the bill.  It introduces, in anticipation, the subject matter of the defence, and attempts to avoid the effect of it, by special allegations. Substantially, the bill enumerates and recites the letters patent of the council established at Plymouth in 1621: the deed of said council to Sir Henry Roswell and others, of 19th March, 1628: the first charter of Massachusetts, in 1629, by Charles I.  From all these, one fact only is material, and that is not in dispute at all, viz. that Massachusetts became a colony of the British crown, at the settlement of it by the pilgrims; and that its southern boundary line first mentioned in the letters patent of 1621, and repeated in the words, whenever occasion required, was by "all those landes and hereditaments whatsoever, lyeing within the space of three Englishe myles on the south parte of the saide River, called Charles river, or any or every parte thereof."

It is obvious from these public papers, the effect of which is admitted by both parties, that the southern boundary of Massachusetts was described with sufficient accuracy; and the only matter to be done to fix it with perfect certainty, was to run on the earth, and through the then uninhabited wilderness, the line described in the charter.

The bill proceeds, after referring to the surrender of the letters patent of the council of Plymouth, in 1635, 17th June, and the planting and purchasing of what now is the territory of Rhode Island; which facts are not material or controverted; to recite the charter of the colony of Rhode Island, granted by Charles II. on the 8th July, 1643, whereby Rhode Island is bounded "northerly on the said south or southerly line of Massachusetts."

The bill states also, the dissolution of the first charter of Massachusetts, by the Court of Chancery in England, the new charter of William and Mary, in October 1691, re-establishing on this line, the ancient boundary in the same words, and the Declaration of Independence of the United States: documents not essential to any con-

troverted point in this suit; unless it be, as before was contended by the attorney general of Massachusetts, and now again respectfully insisted upon, that the Declaration of Independence repealed all these charters, and established the several former colonies in their new character of sovereign and independent states, by the line and boundary actually enjoyed and possessed by them respectively, on the day of their political nativity, the 4th of July, 1776.

All these documents not controverted by the plea, and not to be denied with truth, are admitted with all their legitimate consequences. The bill then proceeds to state, that disputes had arisen, not in regard to any charter, or where the line ought to be drawn in conformity with the provision of those instruments; but where on the earth's surface a line corresponding with the charters should be described. It sets forth the appointment of commissioners by each colony, "to settle the boundary line;" the meeting of those commissioners; and their unanimous agreement, certified under their hands on the 19th January, 1710, 1711; "that a stake set up by N. Woodward, and S. Saffrey, in 1642, and since often renewed, in latitude 41°, 55', being three English miles distant southard from the southernmost part of Charles river, agreeably to the letters patent for the Massachusetts province, be accompted and allowed on both sides the commencement of the line," &c.

The commissioners having thus ascertained a point of beginning, and it being necessary to protract the line from that point which they did not do at that time; the bill recites the appointment of other commissioners by the two colonies, and their meeting at Rehoboth, on the 22d October, 1718, to protract the line; the fact that they reaffirmed the correctness of the place of beginning, ran the line as described by them, certified their proceedings under the hands and seals of a majority of their whole number, and of the delegation of each colony; and that the General Assembly of Rhode Island, passed a resolution on the 26th October, 1718, ordering that the return be accepted, and placed to record in the colony books.

It seemed to the counsel of Massachusetts, that if the bill had stopped here, there would be nothing for the respondents to answer; because it is everywhere admitted in the bill, that the line thus run, is that to which Massachusetts laid claim before Rhode Island was in existence; the line to which Massachusetts was possessed, and over all territory north of which she was in the actual exercise of jurisdiction, when the charter of Rhode Island was granted; and that is all she had ever claimed, or now claims in that direction, by charter, possession, or title of any kind. It would seem, too, that both parties to this suit admitted the line by the charter; that they intended to describe on the earth the line so designated in the charter; that they did so by commissioners mutually appointed on two different occasions, at the interval of seven years; and that the plaintiff had accepted and recorded their proceedings, as satisfactory and conclusive, at the time, now more than one hundred and twenty years ago.

But the plaintiff having thus inserted the bar matter in his bill, proceeds to give his answer to it. It is obvious, therefore, that to this answer, and to so much of this answer only as is material to set aside the bar matter, is the respondent bound to reply. The plaintiff has furnished for the respondent a sufficient defence: he has set up a bar to his own further proceedings; and unless he, removes the bar of his own procuring, the respondent has no need to make any reply. What then, is the allegation in the bill which professes to be sufficient to countervail an agreement of this sort; and of possession in conformity with such agreement for more than a century?

In the first place, it is apparent in the bill, and distinctly admitted by the learned counsel of Rhode Island, that no fraud is charged to anybody in these transactions; but it is alleged that the parties acted under a mistake. It is averred, that the commissioners of Massachusetts, believing, no doubt, that the point which they designated as Woodward and Saffrey's station, was three miles, and no more, from Charles river, affirmed to the Rhode Island commissioners, that it was the proper place of beginning for the line, and that the Rhode Island commissioners, taking the word of the Massachusetts commissioners for true, or searching for themselves and coming to the same conclusion, or examining the map then before them, made by Woodward and Saffrey, were of the same opinion, and jumped together in judgment: and that the commissioners of the two colonies, in 1718, in running out the line, were actuated by the same means, and established the line, which, as ever before, so ever since, has been the actual line of division between these neighbouring sovereignties. And that in all this, without fraud or misrepresentation, there is, nevertheless, a fatal mistake.

It is admitted that all parties acquiesced in the doings of the commissioners until 1749, more than thirty years; when Rhode Island discovered, as is alleged, that the stake of Woodward and Saffrey was more than three miles, viz., seven miles from Charles river; and that the Rhode Island commissioners, and the Rhode Island legislature, acting under this mistake, are not bound by the treaty, compromise, arbitration, or award, and have now a right to claim for that cause, by the intervention of this honourable Court, to set aside the conventions of 1710 and 1718, and re-examine and adjust the boundary on their present information; and by the letter of their ancient charters, as they are now understood by the plaintiff.

The residue of the bill recites the ex parte proceedings of Rhode Island, to determine the true line, independent of the agreements of 1710 and 1718, and the various attempts made to induce Massachusetts to re-open the matter; all which were ineffectual, as is confessed by the fact, distinctly admitted, that for all time since Massachusetts has been a government, colonial, provincial, federative, or sovereign, she has had the actual, undisturbed, quiet possession

and occupation, jurisdiction and control of and over the premises in dispute.

Now it seems to the counsel of the respondent, that to this complaint, thus set, forth, a demurrer might safely have been filed; and that to a bill to which a demurrer would be sustained, any plea or answer must be deemed sufficient. Such bill contains its own answer. It incorporates the defence: and whatever else may be said of the plea, it cannot be deemed inadequate or insufficient for the defence.

But the respondent is unwilling that the record should contain only the plaintiff's coloured view of the treaty, covenant, or arbitrament, entered into in 1710 and 1718. However safe it would be to admit such a mistake as the plaintiff alleges, yet the facts afford a stronger ground; and the respondent avails himself of it.

The plea, therefore, to the substance of which the attention of the Court is now solicited; takes from the plaintiff's bill the whole subject of the proceedings of the commissioners in 1710 and 1718, and treating of each of them severally, avers that the " whole real and true merits of said complainant's supposed cause or causes of action, claims, grievances, and complaints, set forth and supposed in said bill of complaint, were fully heard, tried, and determined, in the hearing and by the judgment of said commissioners; that the agreement was fair, legal, and binding between the parties, and was, in all particulars, a valid and effectual settlement of the matter in controversy; and was had and made without covin, fraud, or misrepresentation, and with a full and equal knowledge of all circumstances by both parties; and that the same is still in full force, in no way waived, abandoned, or relinquished; that the station called Woodward and Saffrey's station, was then well known, the place where it was fixed of common notoriety, and the line run therefrom, as aforesaid, capable of being discovered and renewed; that the said defendant has held and possessed, occupied and enjoyed the land, property, and jurisdiction, according to said station and line running therefrom, from the date of said agreement to the present time, without hinderance or molestation."

It is certainly true, that the plea does not undertake to say that the Woodward and Saffrey station is three miles southwardly of, Charles river, and no more. It does not put in issue, whether now a revision of the line, according to the charter, would describe the same place.

If the plans exhibited in this case, either by Rhode Island or Massachusetts, are correct, no revision could alter the line; for it is clearly within three miles of one of the branches of that river; and the only question would be, whether the charter, by the terms in it, viz.; " on the south part of Charles river, or of any or every part thereof," meant to include one of the forks as part of the river, or not. But the geographical and historical facts, which are notorious, and, of course, to be taken notice of by the Court, (one of which

both these maps prove,) are important in the case. Charles river had never been explored in 1642 by any European, and its borders were occupied only by savages. Woodward and Saffrey went there to determine the river; the offset of three miles; and the line of boundary. It is very immaterial how they determined it.

The stream called Charles river acquired that name not from nature, but man. When and what was called Charles, became Charles; what was called part of the river, was, for all human purposes, thenceforth known and notorious as part of the river. They fixed their station within three miles of water flowing into the main stream. They found or they called this water Charles river. If it was unquestioned, it must have been conclusive. If it was questioned or questionable, if after Rhode Island came into existence, and in 1710, near seventy years after the naming of this water by Woodward and Saffrey, it was brought into question by Rhode Island, it was then a proper subject of settlement, compromise, and agreement for the commissioners; and their decision settled the matter conclusively for all after time. It was the very question they met to settle; and their opinion, judgment, and award, made it what they determined it to be.

The respondent contends, first, that it is not necessary to the sufficiency of the plea, to controvert or notice in any way the suggestion of a mistake.

Secondly, That mistake or no mistake are substantially and sufficiently put in issue by the plea, so that the plaintiff may join the issue there tendered, if he pleases.

On the first point, it is respectfully submitted, that where a party alleges a proceeding to be had under a mistake of fact or law, and sets forth the circumstances in which he supposes the mistake to exist, if by the circumstances so stated it is apparent that there was no mistake, the allegation may be treated as a nullity. The legal inference from the matter so stated, and not the term applied to it, must regulate the pleading of the adverse party, and the decision of the Court. Story Eq. Pl. § 680, and note.

The plaintiff sets forth his circumstances of supposed mistake. They are these: Massachusetts being in possession of a line of boundary, Rhode Island complains, and proposes a joint commission to settle it. Commissioners meet. Governor Dudley, on the part of Massachusetts, tells Lieutenant Governor Jenckes, of Rhode Island, that the true point is the Woodward and Saffrey station. Governor Jenckes, either knowing that fact himself, before; or in some other way being convinced, agrees to it, and signs an award fixing that station as the point of beginning. Nine years after, the same thing is repeated by other commissioners, and the whole line run from that point. The bill does not allege that the Rhode Island commissioner believed the station to be the true one, because Governor Dudley told him so; but avers that he did believe the fact, which being the very thing he was commissioned to ascertain, it must at

T 2

this distant day be supposed, that he believed it on sufficient and satisfactory examination.

It is obvious that in this, by the plaintiff's own showing, is no mistake, as that term is understood in equity.

When negotiators meet to decide a question, it is impossible but that one must make an assertion to the other, which, after the lapse of an hundred years, the generation of the then present period may deem wrong in point of fact. So of arbitrators or referees. If a decision that should appear to the heirs of a remote ancestor to be wrong, could be reinvestigated on the allegation of the losing party, that the verdict or judgment was a mistake, (which every losing litigant is ready enough to make,) there could be no end to lawsuits: and the decision which this Court may pronounce in this case, may, on the same principle, be revived an hundred years, hence, by a suggestion that there was a mistake in the forming of it.

It is impossible that any declaration made by Governor Dudley one hundred and thirty years ago, could be known now; and the suggestion of the plaintiff, in this regard, must be a mere fancy-sketch. The allegation, if made, could be only the declaration of an opinion.

Gov. Dudley died in 1720, aged seventy-three years. 1 Holmes' Annals, 525.

The fact referred to occurred in 1642, five or six years before he was born.

The statement of an opinion is no misrepresentation. Scott vs. Hanson, 1 Simon's Rep. 13. Such a statement is not calculated to deceive, but rather to put the opposite party on his guard. Trower vs. Newcomb, 3 Merivale, 704. Ignorance, which might have been remedied by due diligence and inquiry, is no cause for relief. Perry vs. Martin, 4 John's Chan. R. 566. And Lord Loughborough has emphatically said, ignorance is not mistake.

If the Rhode Island commissioner acted on such representation, supposing it was made, and if it was false, yet his action is not to be considered as founded in a mistake, as that term is understood in equity; because the relations of the two commissioners was not such as to induce one to place a known trust in the other; but the contrary. Fox vs. Mackrith, 2 Bro. Ch. Ca. 420. Smith vs. The Bank of Scotland, 1 Dow. Parl. C. 272. Laidlaw vs. Organ, 2 Wheat. 178; 195. Evans vs. Bucknell, 6 Ves. Jr. 173; 182—192. Such representation would not vitiate a sale; a fortiori, not an arbitrament. Fenton vs. Brown, 16 Ves. 144. 2 Kent's Lectures, 2d ed. 484, 485.

If there was no false representation; if the Rhode Island commissioner believed a fact, the truth of which it was his special duty to investigate, and which he had the means of investigating: and all this appears by the plaintiff's bill, the judgment and the award was not mistake, but conviction. The plaintiff, by calling it a mistake, cannot change the rule of pleading or of equity; and it may be treated as a misnomer or a nullity.

In further considering this allegation of mistake, the great questions arise, in what relation or capacity did the present plaintiff and respondent stand to each other at that time? What was the capacity of the commissioners by whom the line was run? and what is the law of a case so situated?

If the parties now before the Court stand here, as common suitors, corporations, or individuals, controverting the boundary of an estate, and these commissioners are referees or arbitrators mutually chosen to decide the controversy; then the rules regulating the proceedings of an arbitrament and award at common law or equity, may well enough be invoked, to determine the question before the Court. But in this view, the mistake of law or fact, the wrong judgment and erroneous decision of arbitrators, do not authorize the re-opening and re-examining their proceedings. Knox *vs.* Symonds, 1 Ves. Jr. 369. South Sea Co. *vs.* Bumstead, 2 Eq. Pl. Ab. 8. Shephard *vs.* Merrell, 2 Johns. Ch. R. 276. Delver *vs.* Barnes, 1 Taunt. 48. 51. Morgan *vs.* Mathews, 2 Ves. Jr. 18. Jones *vs.* Bennett, 1 Bro. Par. Ca. 411. 28. Ching *vs.* Ching, 6 Ves. 282. Annersly *vs.* Goff, Kyd on Awards, 351. Mitford's Plead. in Eq. by Jeremy, 131, 132. Lyon *vs.* Richmond, 2 Johns. Ch. R. 51. Kleine *vs.* Catara, 2 Gal. 61. Dick *vs.* Mulligan, 2 Ves. 23. Young *vs.* Walter, 9 Ves. 464. Wood *vs.* Griffith, 1 Swans. 55. Auriol *vs.* Smith, 1 Turner and Russ. 125. Goodwin *vs.* Sayres, 2 Jacob and Walker's Rep. 249.

These cases go the whole length of establishing the position, that the mistake of the arbitrator on a matter of fact or law referred to him, cannot be inquired into; or rather, that his judgment and opinion make the rule, and there is no authority above him competent to say that his decision is a mistake. Lord Commissioner Wilson, in one of the cases (Morgan *vs.* Mathews) says, "It would be a melancholy thing if, because we differ from arbitrators in point of fact, we should set aside awards." And Lord Chancellor Eldon, in Ching *vs.* Ching, states in strong terms, "If a question of law is referred to an arbitrator, he must decide it; and though he decides wrong, you cannot help it."

The case is different where arbitrators, conscious of a mistake, desire to rectify it; because, in that position, the supposed decision is not their judgment: and this consideration reconciles any cases of a seemingly different character from those above cited.

This supposed mistake may, however, even on the strict rules of equity practice, be passed without notice in the plea, because the allegation of the plaintiff renders it invalid by lapse of time. It is of ancient date, and from that circumstance impossible to be ascertained; or if ascertained, to have any present operation.

Courts of Equity, by their own rules, independent of any statute of limitations, give great effect to length of time; and they refer frequently to statutes of limitations, for no other purpose than as furnishing a convenient measure for the length of time that ought to operate as a bar in equity to any particular demand. Beckford *vs.* Wade, 17 Vesey, Jr. 2 Scho. and Lefroy, 626. Paul *vs.* M'Namara,

14 Vesey, Jr. 91. Gifford *vs.* Hort, 1 Scho. and Lefroy, 406. Bogardus *vs.* Trinity Church, 4 Paige, 178.

Now, though the question before the Court assumes to be one of pleading, and not of equity, yet it is maintained by the respondent, that a plea is sufficient which leaves no material matter unanswered; that what is not answered redounds to the benefit of the plaintiff; and if this mistake is not answered, it may count for him *valeat quantum*. But if it is in itself immaterial, and of state character, it may be passed over without notice, because it can in no shape make out a case for the plaintiff.

Secondly, the respondent contends, "that all which the strictest rule of equity pleading requires in this case is met by the allegation in the plea, that the "said agreement was fair, legal, and binding between the parties, without covin, fraud, or misrepresentation, and with a full and equal knowledge of all circumstances by both parties." This allegation is not now controverted: and it seems to the respondent's counsel impossible to say, that with a full and equal knowledge of both parties, their unanimous determination of the question submitted to them could be a mistake relievable in equity.

To the form of the plea no exception is taken by the learned counsel for the plaintiff; but he contends, that it is novel and insufficient in this, that it pleads possession as a bar, and not title. To an action at common law or at equity, where the usual statute of limitations applied, this exception might, if well taken in point of fact, cause some hesitation. But it is not founded in a correct estimation of the character of the plea. The respondent, in his plea in bar, asserts his title to the territory in dispute, and derives it from the joint effect of the agreements of 1710 and 1718, and possession under them forever. It may be, that under the peculiar circumstances of this case, neither the agreement, if made against the letter of the charters; nor possession, if held adversely and without consent, could sustain the respondent's claim: nor is it material to inquire how this would be, because in truth and fact the title of the respondent rests on neither one of those pillars alone, but on both; upholding, strengthening, confirming, and supporting each other, and forming together a foundation of irresistible strength. They have not been separated for more than a century; and ought not to be separated now in the matter before the Court. The true character of the plea is, title derived in part from two sources, and concentrating into one point, that of indefeasible right. 1 Chitty's Pleading, 512, and the cases there collected.

But before this plea can be overruled for any technical exception of this or any other sort, the Court will come to the consideration of a much more important and interesting question than yet has been presented; full of novelty and grandeur, and suited to the cause, the parties, and the Court.

The question thus presented is this: By what code of laws, by what forms of proceeding, by what principles of judicial construction, is this controversy to be settled? It is impossible not to per-

ceive, that the case before the Court is not one of ordinary judicial cognisance. It is not the boundary of a farm or a water lot that is in dispute, but the limit of a nation. It is not a question of ownership in the soil that is presented, but of jurisdiction over a territory and its inhabitants. The parties, too, are not ordinary suitors in a Court of justice: they are states, called by the plaintiff "sovereign states;" and standing in that relation to each other, before this high tribunal, which, like the ancient Areopagus, is to adjudicate on the tranquillity and peace of mankind.

The Court, on solemn consideration, has decided, that on these great interests of territorial jurisdiction and state sovereignty, and on the transfer of the allegiance of five thousand people from one civil government to another, essentially different in many of its institutions, customs, and laws, it has a constitutional power to pronounce judgment and decree justice. Be it so: this point is not now to be controverted. But whence does the Court derive this power? Not from its ordinary judicial authority; not as a branch of that prerogative by which it is to decide "cases in law and equity;" but by a special provision of the Constitution, for the administering of which no forms are provided; a power above and beyond the reach of any other judicial tribunal in the world; wholly without precedent in the principles of the civil, the canon, or the common law; and vesting in this high tribunal a discretion and authority, which yet has been limited by no legislation of Congress, nor by any rules or acts of its own.

In a case where "the file affords no precedent," and there is neither common nor statute law to guide the proceedings of the Court, the counsel of the respondent respectfully contends, that the case brings with it into this tribunal its own law, in the principles of an elevated and perfect justice, unfettered—as in their nature they are incapable of being fettered—by technical subtleties and petty for.. It stands upon those great and fundamental doctrines of international law, which, by the common consent of mankind, are the basis of the intercourse of the civilized world.

The high demand of the plaintiff is, that your honours will "restore and confirm to him his violated rights of jurisdiction and sovereignty." These are rights which no private party ever could possess, and over which no other judicial tribunal ever held jurisdiction. The light which is to guide the conscience of the Court in this new field, comes not from books of pleading, or reports of adjudicated cases between citizens or subjects. Such matters belong not to them. It is to be found only in the source of eternal justice, as it comes from intelligence and truth.

The case, examined in the character which it thus properly assumes, however important in principle, is one of easy solution.

The parties to the suit were once colonies of Great Britain. The relation thus sustained is matter of public history, and familiar to the Court. Nominally in a state of vassalage, they were in reality free; and professing a formal allegiance to the British crown, actu-

ally assumed and exercised the prerogatives of sovereignty. They made war and peace; coined money; entered into confederacies; and made treaties of alliance, offensive and defensive, with each other. The proceedings in 1710 terminated in a treaty of boundary, differing in nothing from that of 1783 between Great Britain and the United States, except in extent. No earthly power but the contracting parties ever attempted to interfere with it. It was made by negotiators of each party, with unlimited powers to compromise and settle the boundary. The terms are plain and incontrovertible. The treaty, thus made, established the station of Woodward and Saffrey in latitude 41° 55', to be three English miles from Charles river, and "that, agreeable to the letters patent for the Massachusetts province, it be accompted and allowed on both sides the commencement of the line between Massachusetts and the colony of Rhode Island."

It is obvious from the whole of the plaintiff's bill, that this treaty only confirmed and established what had always before been admitted in point of fact.

In 1718 another treaty was negotiated, confirming the treaty of 1710, and more fully carrying it into effect.

These titles to the territory, founded on the solemn faith of two formal treaties, under and by force of which the respondent has always held "unmolested possession," are presented to this Court, thus held over sovereigns, on a question exclusively of international law, as a bar in equity and justice to further molestation and disturbance.

Whether, being negotiated between colonies, they are entitled by the law of nations to be termed treaties, or only conventions, agreements, or pactions, they are by that law equally sacred. Vattel, 193, § 154, 155; 227, § 215.

Why are they not binding? The suggestion in the plaintiff's bill, that they were not ratified by the mother country, is a poor attempt at self-stultification. They needed no ratification. They were not repudiated by Great Britain; and, like all acts of the colonies, were in force until disallowed. If it were otherwise, it would be more consistent with the high character of our esteemed fellow-citizens of Rhode Island to imitate the Roman honour of the Consul Fabius Maximus, who, when the senate would not ratify his agreement with the enemy, sold his private property to make good his word: or that other Consul, Postumius, who, because the senate would not confirm his treaty with the Samnites, adjudged that he himself and his colleagues should be delivered into their hands.

The answer to all this by Rhode Island is, that the negotiators made a mistake. To this the reply is, that it is denied in the plea. But if the allegation be admitted, the mistake of negotiators never was, and on principle never can be, a just cause for violating the stipulations of a treaty. Of this principle the diplomatic history of the United States is full of examples, and conforms to the diplomacy of civilized Europe.

Possession,—or as it is called in books on international law, usu-caption, for a long period of time, is the best evidence of a national right. Vattel, 187. 191, &c.

The possession of Massachusetts began before Rhode Island was created, and has never been interrupted for a day. This is an insuperable bar to the long delayed claim of the plaintiff. Of itself, it is invincible. The only answer to it now, is, that it is joined with another title, equally strong, which two are not to be united in the same plea. One reply to this objection has already been given; but there is a stronger one in the present aspect of the case. Under the law of nations, forms cannot obstruct justice. There are no technicalities; and no Common Pleas practice, in a Congress of nations; nor can any be admitted before this august tribunal, sitting under its high constitutional commission, to settle the rights of sovereignties, and to administer justice in political controversies between independent states.

Mr. Hazard, with whom was Mr. Whipple, for the state of Rhode Island.

I had endeavoured to prepare myself to argue the questions of law which the state of the pleadings presented to the Court; intending to confine myself strictly to those questions, that I might not trespass upon the time or patience of the Court. I did not anticipate, for I could not believe that the defendant's counsel would, himself, bring into view the merits of the main cause, in a trial upon his own plea in bar to those merits, interposed to prevent their being put in issue or tried. But, finding myself mistaken in this, it becomes necessary for me to pay some attention to the statements made by the counsel, lest he should consider them as being acquiesced in.

The facts stated in the plaintiff's bill, we think, constitute a good cause for the relief asked for. And we believe that we can prove those facts. The defendant, while, by his pleading, he excludes those facts from the issue and from trial, himself makes statements which we are not permitted to disprove; because they also are excluded by him from the issue and from trial. But there is this distinction between the statements made by the respective parties. The defendant has no right to state facts which he refuses to put in issue, or have tried. But, it would not be departing from the merits of the law question of the sufficiency of the plea in bar, for the plaintiff to show the material facts he would be able to prove, if not precluded by the defects of the plea. At present, however, I ask leave to appeal to facts, only so far as may be necessary to correct the erroneous statements made by the defendant.

I understood the counsel to say, that he resorted to the merits of the cause, and to one of the charges in our bill, for the purpose of showing that, at the time of the Roxbury agreement of 1710, 1711, there was a serious misunderstanding between the parties as to what was the most southerly part of Charles river, at the distance of three English miles south from which the southern boundary

SUPREME COURT.

line of Massachusetts was to be run east and west, agreeably to her charter; Rhode Island claiming to measure from Charles river proper, as it is now known; while Massachusetts insisted upon taking the head of a brook, called Jack's Pasture brook, or Mill brook, as the most southerly part of Charles river; and that this misunderstanding led to a compromise which was effected by the agreement at Roxbury. But the charge referred to negatives instead of countenancing this supposition. For it speaks of the pretence about Jack's Pasture brook, as one that is set up against the present claim of Rhode Island, which was made upon Massachusetts, in 1748; and has since been adhered to and prosecuted to the present time. But besides this, it is plain from the reports of all the committees from 1710, 1711, and 1718, to 1791, that Mill brook was never thought of as in any way affecting the question of the boundary line, until the idea occurred to, and was for the first time, started by the Massachusetts committee of that last year, 1791. In the old reports of 1710, 1711, and 1718, no mention is made of any such brook; and it is not likely that the committees knew of its existence, for they took no view even of Charles river itself. They adopted the supposed Woodward and Saffrey station, because set up (they said) by skilful and approved artists, so far back as 1642; and believed to be on the true charter line. The same ground was taken by the Massachusetts committee of 1750, which was appointed, as the report shows, to run the line from the pretended Woodward and Saffrey stake. Not to ascertain what was Charles river, nor where the true boundary line was or ought to be, nor to run any such line. But, after the Rhode Island committee of 1750 had by actual view and survey ascertained the true charter line, and found that the line chalked out by Massachusetts for herself, was really eight, instead of three miles off from Charles river, and gave to that colony a part of the Rhode Island territory, averaging five miles in breadth by twenty-three in length; it would not do any longer to rest upon the naked authority of the imaginary. Woodward and Saffrey stake, which had been acquiesced in, only because it had been asserted to be on the true line, and nothing to the contrary was known. The Massachusetts committee of 1791, therefore, cast about for something to give a colour of pretence for adhering to the old position, after it had been thus exposed. And in their difficulty, they quit Charles river, and run up into Mill brook, and through Whiting's pond, two and a half miles off, and then into another brook still further on. Their report (annexed to the bill) shows this. After mentioning that the Rhode Island committee measured from Charles river as it now is, they say, " we have inserted our own survey of what we conceive to be the most southern part of Charles river," &c. And the report then tells how they made the matter out, as has just been related. Here it appears, that the pretence about Mill brook was a new one, and their own. They do not speak of it as having ever before been thought of, but as a conception of their own.

The allegation, therefore, that there had been a dispute about this

brook, in 1710, 1711, which had led to a compromise then made, is wholly unsupported and unfounded. Indeed, the idea that Charles river ever could have been mistaken for Mill-brook, or the brook for the river, or that they ever could have been identified and taken for one and the same, appears to me to be preposterous. Charles river had its present name, the only name it has ever had, even before the first settlement was made by the Massachusetts colony. It was so named in the first charter, by King Charles I., to that colony, in 1629. Whoever first went there and saw it, marked it as one of the great natural boundaries for the colony. A boundary definite and permanent, about which there could be no uncertainty or dispute. Having the broad river before their eyes, although in the wilderness, and not far to be seen, it is not likely that they spied out the particular tributary brook, much less that they groped their way through the bushes and swamps, to see where it came from, that they might honour it; Whiting's pond, Jack's Pasture brook, and all, up to the big chesnut tree, with the name of the king.

The counsel thinks that he sees evidence of a compromise in the clause of the Roxbury agreement, leaving five thousand, or the land within one mile north, to the inhabitants of Providence or others. But the committee assigned their own, and a different reason, for that clause; which was, that some of the inhabitants of Providence had laid out lots there. But it is not pretended that any notice was taken of that clause by the government of Rhode Island, or that it was ever acted upon by either government. Again, if the Roxbury committee had been making a compromise instead of ascertaining and fixing the charter line, their report would have shown it, and the grounds of it. They were bound to show this; for their respective legislatures had a right to know what they did, and why they did it. Now, the report of this committee, on the face of it, negatives the supposition of a compromise. It professes to go by the charters; and that the station agreed upon was on the true charter line, and no more than three English miles from Charles river. And so the General Assembly of Rhode Island was led to believe; and not that any thing was done by way of compromise. A singular compromise it would have been certainly, had it been so intended; by which Massachusetts took to herself five miles of the Rhode Island territory, and in consideration thereof, allowed the inhabitants of Providence or others, to retain the land within one mile, but under her jurisdiction. Whether that territory does or does not justly belong to Rhode Island, by her charter, and equally so by the charter of Massachusetts, is the question which constitutes the merits of the main cause; and can only be tried when those merits are put in issue.

Some further disclosures are made in the report of the Massachusetts committee of 1791, which ought not to be overlooked. Having mentioned, that Old Plymouth colony and Rhode Island had the same northern boundary on Massachusetts, the report says: "The erection of a third government, referring to the same bounds,

(the Rhode Island charter of 1663 had then just been granted,) seems to have rendered it necessary for Plymouth and Massachusetts to ascertain their bounds." Accordingly commissioners were then (in 1664,) appointed, who "fixed upon a large tree, called the Angle tree, as the north line of Plymouth and the south line of Massachusetts," &c. "This, (says the report,) the commissioners apprehend to have been the true and original boundary; and is three miles south of the most southerly part of Charles river." They then mention the appointment of commissioners by Massachusetts and Rhode Island, in 1718, "who fixed a new station, about two miles north of the angle tree," called Woodward and Saffrey station. "This commonwealth then lost two miles in width along the northern line of Rhode Island."

Thus these Massachusetts commissioners themselves falsify the pretended Woodward and Saffrey station, which they call a "new station," fixed upon in 1718. And it is a striking fact, that although the settlement with Plymouth was only twenty-two years after the date now assigned to the Woodward and Saffrey station, yet, in that settlement, not a word was said about any such station. The plain inference is, either that none such existed, or that Massachusetts concealed it for the purpose of gaining two miles more upon Plymouth; and that with a view to fixing a line for Rhode Island, without giving Rhode Island any notice of her doings, or allowing her to be a party to them. The probability is, that no such station was ever heard of, until Colonel Dudley asserted that there was or had been one. The report in my hand states, that no record of it had been preserved. The Massachusetts committee of 1750, say that they found none; and it is plain from all the other reports that none existed at their dates. Even Dudley himself did not pretend that he had ever seen any. And there is not in the whole case, a particle of evidence that there ever was any such station in existence.

It is necessary that I should now take one more look at this now important Jack's Pasture, or Mill brook, and notice the use which the Massachusetts committee of 1791, endeavoured to make of it; and which the defendant endeavours to make of it, since it was then brought into notice. That committee, in its report, says: "It may not be unnecessary to observe, that at the northern head of what we call Charles river, is a place known by a large chesnut tree; thence the stream descends to Whiting's pond, where it forms a considerable lake, and afterwards resuming its proper shape, (and now known by the name of Mill river, or brook,) pursues its course in a northerly direction till it joins that stream, which is known by the name of Charles river." Here the committee themselves mark the distinction between Charles river and the brook that runs into it, calling each by its own proper name, by which it had always been known and still is. If all the tributary streams which find their way into a river are to take its name, and to be considered part of it before they reach it, and contribute their mites to its

waters, then would there be a mighty change in the great natural boundaries by rivers, between nations and states, and even counties.   If the Mississippi should be so measured, it would be a wonderful river to behold; and many a great state, and parts of states, would disappear from the map of the United States.   But the Missouri is not the Mississippi, nor part of the Mississippi, until it joins it; and if a state should be bounded on a line to be run twenty miles distant from the Mississippi, nobody would dream of measuring the twenty miles from the Missouri as part of the Mississippi. When two rivers, or streams, come together and form one river, which keeps the name of one of the branches, that name can never be understood to comprehend the other branch, having a distinct name of its own.   If, therefore, this Mill brook, instead of being a mere streamlet creeping into Charles river, was really a principal branch of Charles river, having its own proper name; neither that name nor the brook could ever be confounded with the river or its name, until they were swallowed up in the main river.

Here, your honours have the real and only question between the parties, upon the merits of the cause under the charters.   That question (as first raised by Massachusetts committee of 1791, and never before) is, whether the first charter granted to Massachusetts, by King Charles I., in 1629, by the name "Charles river," meant Charles river proper, as it was then and ever since has been known and called; or, besides this, meant also Jack's Pasture, or Mill brook, running from near a large chesnut tree into a pond called Whiting's pond, two and a half miles off from Charles river, meant also the said Whiting's pond: and, moreover, another brook running out of the pond, and finally getting into Charles river.   This, I repeat, is the only question upon the merits, as the defendant himself has made it.   If the defendant is willing to have a trial upon the merits, let him put them in issue, or allow us to put them in issue.   Both parties would then have an opportunity to produce their evidence applicable to that question.   Among other evidence, we have in our possession certified copies of a large number of original grants, from 1659 to 1698, to individuals, of lands, bounded, some on Charles river, and some on Mill brook, or Jack's Pasture brook; all of them showing, that the river and brook were never confounded together, but, were always distinguished by the same separate names they now are.   We have also much other material evidence upon that question of the merits.   But your honours cannot now hear any of it, because that question is not in issue, or on trial.   The defendant virtually acknowledges the original title of Rhode Island, by setting up a supposed cession or grant from her, in bar of that title.   Let him, then, present that bar matter and our reply to it, in such a manner that they can be fairly tried.   Let him not deprive us of a fair trial upon one question or the other, either upon the merits, or the bar, or both; as he had it in his power to do under the twenty-third rule of practice established by the Court: allowing a defendant to have the benefit

of his bar matter, under his answer to the merits, as fully as he can · by pleading it specially.

I will now proceed to consider the question of the sufficiency of the defendant's plea as a bar.

This plea is in bar to the whole bill.

The requisites of such a plea being familiar to the Court, we have only to inquire whether the present plea possesses those requisites. Our objections to it, I will endeavour to bring under one or other of the following heads: 1. The matter of the plea does not constitute a bar to the relief prayed for. 2. The plea does not contain the statements of facts, and the averments necessary to a good plea in bar. 3. The plea is not accompanied by such an answer as the rules of equity require to support such a plea, and to give to the plaintiff the benefit of the material facts charged in the bill in avoidance of the plea.

The plea commences with relating that in the year 1642, a station was erected and fixed at a point then taken and believed to be on the true boundary line between the two states. So mere a story as this, would be thought too loose and light for the use of a common annalist, whose work is very unlike that of a special pleader. A station was taken, it is said; and we are left to conjecture that it was erected by one Woodward and one Saffrey, by its being called the Woodward and Saffrey station; who in another place are called skilful and approved artists. But the Massachusetts historian, Dr. Douglass, tells us, that they were two illiterate and obscure sailors, and would never have been heard of but for the controversies between Massachusetts and Connecticut and Rhode Island. There is no report or statement from Woodward and Saffrey themselves of their doings, and no record of any. The plea says that the station then set up was believed to be on the true line. This mode of expression would hardly have been used if any actual survey had been made, and the real charter line ascertained by actual measurement. The plea avoids stating that Woodward and Saffrey were employed by Massachusetts, or authorized by anybody. If they acted under the orders of the Massachusetts government—which I do not doubt, if they acted at all; which I do doubt, because I see no reason for believing it—then, what was done was the ex parte act of Massachusetts, and not binding upon anybody. It is not pretended that any notice was taken of Rhode Island in what was done. Indeed, it was only about six years before that date, that Roger Williams and his companions, having been exiled from Massachusetts for conscience' sake, took refuge in Providence. It is a matter of history, that neither Rhode Island, Connecticut, New Hampshire, Maine or Plymouth, were acknowledged by Massachusetts, at that day, as possessing any power independent of herself. At that early period, she assumed to be mistress over all the surrounding territories; and she drew her lines and erected her stations as she pleased, without consulting her feeble neighbours, and in defiance of them. And that she most wantonly encroached upon them all, is a matter

not only of history, but of judicial record. It seems to me that the defendant can add no strength to his plea in bar by basing it upon his own ex parte act, and insisting upon that act as the source and foundation of all the subsequent proceedings which he sets up as matters in bar to a claim founded upon his own charter as well as upon the charter of a sister state.

The plea proceeds to state, that, by virtue of an act of the General Assembly of Rhode Island, passed the 30th of July, 1709, Major Joseph Jenckes was appointed to meet Colonel Dudley, who was appointed by Massachusetts, and to settle the misunderstanding about the line, &c.: "provided it be within six months after passing of the act of the said Assembly;" that "said Jenckes and Dudley, on the 19th day of January, then next ensuing, and within six months from the passing of said act," did meet and conclude the following agreement, &c. Here is an error in the reckoning of time apparent on the paper. The recited agreement is dated, "Roxbury, January 19th, 1710-11," which was eighteen months instead of six months, after the passing of the act referred to. The mistake of defendant probably arose from not noticing the double dating practised at that day, and including both the old and the new style. By the old style the year commenced and ended on the 25th of March. So that the same month of January, which was part of the year 1710, by the old style, was the commencement of the year 1711, by the new. But, take it either way, the month of July, 1709, was eighteen months prior to the date of the instrument. This being the case, the agreement of Jenckes and Dudley was null and void: Jenckes' authority to act having expired a year before he did act.

The case would have been altered, had the two governments afterwards confirmed the instrument. But no such thing was done by either government, and is not alleged to have been. This instrument, therefore, is no bar to the bill.

But, as every subsequent proceeding set up in the plea is therein averred to have been based upon this Roxbury agreement, and taken in pursuance of it; and as it is from and under and by virtue of this agreement, that defendant claims to have held possession; I will, with permission, make some remarks upon it, for the purpose of showing its character, and the manner in which it was obtained.

It is stated, that the committee met at Roxbury, and then and there debated the challenges concerning the several charters, &c. relating to the line between the two colonies. This reference to the charters makes them part of the instrument as much as if they had been annexed to it. Now, by the Massachusetts charter, her southern boundary line was to be three English miles south of the most southerly part of Charles river. Thus, the plain duty of the committee was to go to Charles river, ascertain the most southerly part of it, measure off the three miles south, and thence run the line east and west, or erect a monument from which the line might be run. But the committee performed no part of this duty, and took no single step by which the object of their appointment could be effected.

They took no view of Charles river, made no survey or measurement, nor any attempt to ascertain the charter line. On the contrary, Jenckes went to Roxbury, two miles out of Boston, and thirty or forty miles from the place where his business called him; and there, at the door of Governor Dudley, they debated the challenges, as they call it. This is easily accounted for, and can be accounted for in one way only. The two committees and their respective colonies were very differently situated. It was plainly for the interest of Rhode Island, to have the true charter line ascertained and established, and not to be tied down to the ex parte doings of Massachusetts. But Massachusetts had already carved for herself, and was desirous only of keeping what she had taken; and it was, therefore, the purpose of Dudley, her commissioner and governor, to draw Jenckes away from Charles river, and to avoid having any inspection or actual survey taken, by which, at the same time that the true charter line was ascertained, it would be made to appear that Massachusetts had encroached largely upon Rhode Island. And Dudley gained his point, and brought Jenckes to join with him in saying and agreeing that " the stake set up by Nathaniel Woodward and Solomon Saffrey, skilful and approved artists, in 1642, and since often renewed, &c., being three English miles distant from Charles river, agreeably to the letters patent for the Massachusetts province, &c., should be the commencement of the line, &c." Can it be doubted who dictated this instrument, and who drew it. These representations of the doings of Massachusetts agents were palpably made by Dudley, the then Massachusetts agent, to Jenckes. Jenckes did not know that there ever were such men as Nathaniel Woodward or Solomon Saffrey; or that they were skilful and approved artists; or that they ever set up any stake anywhere; or that it had been often or ever renewed. He did not even know that any such stake then existed, much less that it was three English miles, and no more, from Charles river. Yet, all this Dudley induced him to subscribe to. If it was allowable here, we could show that the very same language used in this report about Woodward and Saffrey, and their skill, and their station, &c. &c., was Dudley's language, used in a communication from him made four years before. And the very truth is, that Jenckes' appointment was procured by Dudley himself, as appears by the vote itself, passed by the General Assembly in July, and referred to at the commencement of this plea, as giving Jenckes authority to act. Which vote recites, that, " whereas, the Assembly has been credibly informed that his excellency Colonel Dudley has declared, that if Major Joseph Jenckes was empowered thereto, he doubted not but that they two should settle," &c. &c. The General Assembly did not foresee the use that Colonel Dudley was to make of his Major Jenckes.

I do not forget that we are now trying the sufficiency, and not the truth of defendant's plea. But the averments in the plea cannot cover or protect such marks or evidences of mistake, misconduct, undue influence, &c. &c., as appear upon the face of the instrument

itself, pleaded in bar; for these go to show the invalidity of the bar. There are other such marks on this instrument. The line, it says, is to be run " as is deciphered in a plan or tract by Nathaniel Woodward and Solomon Saffrey, now shown to us, and is now remaining on record in the Massachusetts government." It is a trifling circumstance to remark upon; but it is now acknowledged, that the plan or tract spoken of was never on record in Massachusetts, otherwise than as it was deposited in the secretary's office ; and, if Dudley then had it at Roxbury, it was not then remaining on record. But what had Jenckes to do with this ex parte plan, any more than with the ex parte station of Woodward and Saffrey ; of neither of which had he any knowledge beyond the mere assertion of the adverse party. And let me ask, why was not that plan or tract, or a copy of it, annexed to the instrument of which it was made a part, and which, without it, was a nullity, and could not be carried into effect, any more than a bill of sale of certain articles enumerated in an inventory not annexed or identified ? And where is that pretended plan now, that it is not produced here ? The counsel says, that it is on record, or on file ; and will be produced on proper occasion. And is not this the proper occasion, when the validity of the instrument, of which the plan is made part, is on trial ; and that instrument cannot be understood without the plan it refers to and rests upon ? The counsel have procured and produced a recent plat to show the importance of Mill brooke. Can it be believed that the pretended Woodward and Saffrey plan would not be produced, if any thing favourable was to be found in it ? I have no doubt that there was, at some time or other, and now is, a scrawl of some kind, which has been called the Woodward and Saffrey plan or tract. But I am confident, that, whenever it makes its appearance, it will be seen that the person or persons who made it, whether Woodward and Saffrey, or somebody else long afterwards, were grossly ignorant ; and no glimpse of light can be obtained from it to aid in ascertaining the line between the parties.

Lastly, the committee agree that persons should be appointed by the governor and counsel of each state, to show the ancient line, &c. Here we see Governor Dudley again. Massachusetts had, and still has, a distinct political body so entitled, and with the power of appointment; but there was no such body in Rhode Island. Jenckes knew this, and yet he repeated after Dudley whatever was dictated to him. But no such committee was ever appointed by either government; and is not alleged to have been.

Next, the plea recites parts of votes passed by the two legislatures, in 1717 and 1718, appointing another committee to settle the line, and then sets out the agreement made by those committees at Rehoboth, October 22d, 1718. And the plea avers that those committees were appointed, and the agreement made " in pursuance of" the Roxbury agreement of 1710, 1711, which I have just been examining.

It appears that both legislatures, by their first votes, did restrict

their respective committees to the Roxbury agreement. But the Rhode Island legislature, by its subsequent vote, passed June 17th, 1718, expressly disowned the Roxbury doings, and gave its committee unrestricted power to settle the line, as near as might be, according to the charter; and the Massachusetts legislature, by its second vote, gave the same power to her committee. And thus the Roxbury agreement, which was void in itself from the beginning, was abandoned by both parties.

The Rehoboth agreement, (as it is called, from the place where it was made,) is in eight and a half lines, with a preamble: and the whole of it is, that the line should be run from the Woodward and Saffrey stake, so as to be at Connecticut river two and a half miles south of a due west line. This agreement is liable to some of the same material objections that have been made to the Roxbury agreement. The committee paid no regard to the charters, nor made any attempt to ascertain the true charter line. They arbitrarily adopted the pretended Woodward and Saffrey stake, wherever it might be; without knowing that there was any such stake, or going to see either that or Charles river. The plea then alleges, that the General Assembly of Rhode Island accepted this Rehoboth agreement, and ordered it to be recorded; and thereby ratified and confirmed it. I will consider, presently, what kind of ratification this was.

The plea now introduces the last instrument upon which it relies, and which has been called the report of the running committee. That committee consisted of four persons, who say, in their report, that they were appointed by the Rehoboth committee to run the line by them agreed upon. This is the only evidence there is of their appointment by anybody. The Rehoboth report speaks of no such committee; and none such was appointed by either colony. Whatever their authority was, they undertook to run a line, and say in their report of it, that "having met at the stake of Nathaniel Woodward and Solomon Saffrey," &c. &c. This was speaking loosely. The stake set up by Woodward and Saffrey, in 1642, (if ever set up,) certainly was not in existence in 1719. Their meaning probably was, that the stake they met at was where the Woodward and Saffrey stake had been. But how did they know this; and what authority had they for saying it? No doubt there was a stake where they met, for they would not have been carried there without a stake for them to start from. But who set up that stake, and where was it set up? Neither the Roxbury committee of 1710, 1711, nor the Rehoboth committee of 1718, set up any stake or monument. They only speak of a stake said to have been set up by Nathaniel Woodward and Solomon Saffrey, in 1642, and since often renewed, in latitude 41° 55', (says the first committee,) but they saw no such stake, nor knew that any such existed. Thus this running committee had nothing to go by. They had not the plan or tract of Woodward and Saffrey, nor did they take the latitude 41° 55', on which the Roxbury report said the Woodward and Saffrey stake was set up; for that latitude would, in fact, have carried

them many miles off from the stake where they met; which, as appears from the line described by the committee,) was in latitude 42° 3'. By their own showing, the running committee had no power to fix any station, or set up any stake themselves. How, then, did they know that the stake they saw was where the Woodward and Saffrey stake had been? They could only believe from what was told them; and that, in all probability, by persons interested, and who had themselves set up the stake they wished the line to be run from. It was the tradition in that quarter for many years, and derived from the old men of the day, that the pretended stake was a bean pole, stuck up by John Chandler, one of the running committee. At all events, that committee had no right to hear evidence, for they had no power to decide.

Thus, from all that appears, there is as good cause for believing that the stake from which these four men started, was any where else, as that it was at or near the place of the Woodward and Saffrey stake, if there ever was any.

For myself, I can see nothing in all those proceedings, from beginning to end, but imposition, and the exercise of undue influence over the Rhode Island committees.

The plea then alleges, that the said report or return of the running committee "was approved by the General Assembly of the said colony of Rhode Island," &c. This is copied from our original bill; but in the amended bill, (page 36,) those words are stricken out, being incorrect, and the words, "the above return is accepted by the Assembly: a true copy, extracted from the public records of the colony of Rhode Island, examined by T. Ward, secretary," inserted. That being the minute appearing on the document itself. I have no desire to be critical, but it may be observed, that there is no vote of acceptance. A secretary or clerk can only certify to a copy of a vote. He has no authority to certify that such or such a thing was done, or vote passed. The record is the only evidence of votes; and certified copies are the evidences of the record.

But what does it amount to, if there were such a vote? It was no more than the ordinary form on such occasions. When a legislative committee makes a report, something is to be done with it; and the usual course is to receive or accept it; and then it is laid on the table, or ordered on file, or taken up and acted upon. The same course was pursued in the legislature of Massachusetts, as appears by the secretary's minutes, on some of the reports of their committees. But the report so received or accepted is nothing of itself, until some legislative act is passed upon the subject of it.

But the legislature of Rhode Island never passed any act confirming the doings of either of those committees, or establishing either of the lines (for they all differ) spoken of by them. Nor did the legislature of Massachusetts ever pass any such act; and it is not alleged that she did. And, if one of the governments had confirmed those proceedings, by ever so solemn an act of ratification,

the other could take no advantage of it without passing a similar and mutual act of confirmation on her part.

But as there was no such ratification by either government, it seems that the defendant would now set up the doings of the committees, as binding and absolute in themselves, without any legislative acts confirming them: thus making the committees independent of, and paramount to, the legislatures which created them. This is novel, and I should think, dangerous doctrine. If this is true, the moment the legislature passed a vote appointing a committee to perform a certain service, it parted with all power over the subject; and could neither revoke the appointment, nor vary, nor in any way touch the powers of that committee. This was not the understanding of either legislature at the time of passing the votes and appointing their committees, as has already been shown. The boundary line between Massachusetts and Connecticut (which by their charters was precisely the same as ours) was agreed upon by a joint committee, in 1713; and the doings of that committee were ratified and confirmed by mutual acts passed by both legislatures: and it was those legislative acts of confirmation, and not the report of the committee, upon which Massachusetts wholly relied in their subsequent dispute respecting the line. And even those solemn acts of ratification were set aside for the same causes and grounds which we are now presenting to the Court. This, as I before remarked, is new ground, even for Massachusetts to take. For her own committee of 1791, (whose report, jointly with the Rhode Island committee, is copied into our bill; and whose separate report to their own legislature is annexed to the bill, and has already been referred to,) that committee, remarking that the proceedings of the former committees had not been confirmed by either government, joined with the Rhode Island committee in recommending to their respective governments, "to submit the matter in dispute to indifferent men of the neighbouring states; or to unite in an application to Congress to settle the same, agreeably to the respective charters, and the Constitution of the United States."

I have thus far endeavoured to show from the plea itself that the matter contained in it does not constitute a bar to the plaintiff's bill; and will now, with permission, proceed to the two other general grounds of objection, which, as they are closely connected, I will consider together. They are, 1st, That the plea does not contain the statements of facts, nor the averments necessary to a good plea in bar; and 2d, That it is not accompanied by such an answer as the rules of equity require to support such a plea, and to give the plaintiff the benefit of the matter charged in the bill in avoidance of the plea. I wish it to be understood that we make no objections to the mere form either of the plea or answer. Our objections are to the merits, and substance of them. And we contend, that not a single material fact charged in the bill in avoidance of the bar matter pleaded, is negatived or met by any averment in the plea, or by

the answer. So that, as the plea and answer now stand, the defendant would avail himself of his legal defence, while he would exclude the plaintiff from all the equitable facts and circumstances, charged in the bill in avoidance of the bar; which, by the rules of equity, a defendant is not permitted to do.

In avoidance of the two agreements plead in bar, viz. that made at Roxbury in 1710, 1711, and that at Rehoboth in 1718, the bill charges that the Rhode Island committees who signed those instruments were misled by representations made to them by the Massachusetts committees, and acted under the mistaken belief that the pretended Woodward and Saffrey station was really on the true charter line, and was no more than three English miles from the most southerly part of Charles river; and that under this erroneous belief they signed the agreements; which, if confirmed, would transfer to Massachusetts a large portion of territory justly belonging to Rhode Island, and the jurisdiction over it. This is the general charge; and in support and proof of it, the bill charges the following facts, viz. that by actual survey and measurement, it is proved that the line alleged to have been run according to those agreements is near eight miles, instead of three miles, distant from the most southerly part of Charles river, and takes from Rhode Island a tract of territory four miles and fifty-six rods wide on the east, and over five miles on the west end; and in length, twenty-three miles: that said line does not conform to the line designated in either of said agreements, it being in latitude 42° 3' N., whereas the supposed Woodward and Saffrey station is alleged to have been in latitude 41° 55': that neither of said committees made any survey or measurement, nor any attempt to ascertain the true charter line: that, at the dates of said agreements, there was no such station as the pretended Woodward and Saffrey station, nor any evidence that there ever had been any: that said committees saw no such station, and took no step to ascertain whether there then was or ever had been any, or how far it was from Charles river, if it did exist.

It was the duty of the plea to have met and negatived the main charge by direct and positive averments; but there is no such averment to be found in the plea. The principal averment is, that there was no covin, fraud, or misrepresentation. The bill does not charge covin or fraud, although it might justly have done so. The averment of no misrepresentation, is evasive, and no direct negative; for the defendant might admit that such representations were made as the bill charges, and yet might consistently aver that no misrepresentations were made, for he might say they were true. But it is of little importance from what source the committees received their impressions; it is enough that the bill charges that they acted under an erroneous belief; and this charge is not touched by any of the averments. The other averments are, that the whole merits of the plaintiff's claim were heard and decided upon by the committees: that the agreements were fair, legal, and binding, and made with a full and equal knowledge of all circumstances by both parties. All

the first part of this is mere opinion and assertion. A man charged with a breach of contract, might as well reply that he was an honest man, and a man of fair standing. The sweeping allegation that the agreements were made with a full and equal knowledge of all circumstances, has none of the qualities of an averment required in pleading. It is no traverse of any specific charge or fact. No fact charged, however important, could be put in issue under it. Yet that is the whole object of averments in the plea; which are therefore required to be direct and positive, not evasive, or by way of opinion, inference, or implication, which it is the province of the Court to deal with, not the party.

The bill also charges that the legislature of Rhode Island was deceived, and led to believe that its committees had ascertained the true charter line: that there really was such a station as the Woodward and Saffrey station; and that it was on the true line, and no more than three miles from Charles river. This charge is most important, because the legislature, if it had not itself been deceived, could have corrected the errors of its committees. Now there is not a word in the plea or answer that in any way meets, much less negatives, this main charge; which goes to the roots of the pretended agreements. And the defendant might as well have put no averments at all into his plea, and accompanied it with no answer; and still have insisted upon having the pretended agreements sanctioned and allowed to be valid, without any examination whatever. Will equity countenance any such practice? It is observable that the Roxbury agreement is so framed, and contains such statements, as could not fail to mislead and deceive the General Assembly of Rhode Island. The committee professed to go by the charters and letters patent of the two colonies; as the legislature of Rhode Island expected they would, and supposed they had done. The committee then adopt the supposed Woodward and Saffrey stake, " being (they say) three English miles distant from the southernmost part of Charles river, agreeably to the letters patent for the Massachusetts province." It cannot be averred here that Governor Dudley had no hand in making this representation. And how was it possible for the legislature of Rhode Island to avoid being deceived by this representation?

So much for the averments in the plea. And now for the accompanying answer—if that can be called an answer, which is a mere repetition of the averments in the plea, without the slightest addition to them. Can such an answer be said to support the plea, as the rule in equity requires that it should? But, to support the plea is not the only office of the answer. It must meet and respond, particularly and specifically, to every fact and equitable circumstance charged in the bill, in proof of the main charge in avoidance of the bar matter pleaded; to the end that the plaintiff may have the benefit, and avail himself of his equitable defence against the bar. If the answer cannot do this with truth or safety, then the plea is not only a defective and insufficient one, but is an improper plea to be

used. May I not correctly say that this plea is not supported by such an answer as the rules of equity require; and without which the plea cannot be sustained?

Again, the bill charges, that the agreements now set up were never consented to by the king of England; without which, at that day, the colonies had no power to make any compact affecting their territories or jurisdiction. This being the case; it was necessary for the plea to show the authority of the two colonies to act, as it was to show the authority by which their committees acted. This same objection was made by the state of Connecticut, in her controversy with Massachusetts about their boundary line; and made too against the validity of the solemn acts of the two legislatures. And how was it met by Massachusetts? Her reply was, that her government, by its charter, was required to send all its public acts to the king, for his approbation; and that such of them as were not disallowed within a certain period were to be considered as allowed. It was, therefore, inferred by Massachusetts, that this course must have been taken upon the occasion of her compact with Connecticut; and that that compact had been tacitly consented to by the king. In the case of Pool *vs*. Fleeger, recently decided in this Court, there was a formal compact between the states of Kentucky and Tennessee, settling a boundary line between them; which compact was formally ratified by both governments, and consented to by Congress. The Court said in that case: "It is part of the general right of sovereignty belonging to independent nations to establish and fix disputed boundaries. This right is recognised by the Constitution of the United States, with the limitation or restriction requiring the consent of Congress." As, therefore, the consent of Congress is necessary to the validity of such a compact, even at the present day, it follows, that a party who pleads such a compact in bar to a suit, must show its validity, by stating the consent of Congress to it. But in the present case, the bill itself charges the defect in the Roxbury and Rehoboth agreements; and the charge ought to have been directly met and responded to by the plea and answer. It is for the purpose of showing the insufficiency of the plea, in this respect, that I mention the charge contained in the bill; and not for the purpose of discussing here the objection itself to the two agreements which would not now be proper. But the plaintiff has a right to be heard upon that question at a proper time, and therefore, the defendant was bound to respond to the charge.

The plea concludes by stating, in substance, that the defendant doth plead the said agreement of 1710, 1711, and the said agreement of 1718. "And unmolested possession according to the same, from the date of the said agreements, in bar to the whole bill," &c. The opening counsel for the defendant has considered the alleged possession as constituting a distinct bar of itself. If this is the meaning of the plea, it is pleading double; which is a fatal objection to any such plea. The passages, therefore, read by the counsel from Vattel, to show that prescription may give a good title, are

out of place; supposing that the counsel did not mean to spoil his own plea. To be sure he ought to understand his own plea best; but I suppose that long possession under the two agreements, is alleged in the plea for the purpose of aiding and protecting them from inquiry into defects in their origin. Long possession is frequently used for this purpose. But this plea alleges long possession only. It alleges no acquiescence in or assent to that possession, without which mere naked possession is of no avail; for it furnishes no inference of the fairness of the original transaction, sought to be sustained. This may be illustrated by a very common case. A man obtains a conveyance of an estate, by imposition or some unjustifiable means, which, in equity, vitiates and annuls the transaction. And, having got possession, he retains it for many years. But, in the mean time, the injured party, having discovered the imposition or mistake, and the injury done him, demands restitution from the wrongdoer, who holds many conferences with him; but evades the claim and avoids any inquiry into the justice of it, continues to hold possession. It is plain, that in such a case, the continued possession of the wrongdoer, instead of bettering the original transaction, aggravates its injustice. It is laid down by Vattel, page 192, that even prescription or usucaption, cannot be set up against a party who is not in a condition to enforce his rights. This is precisely the plaintiff's case. And this case is clearly and fully made out by our bill. And if the defendant had given us a sufficient plea and answer, so that we might have taken issue, the question of her alleged possession might have been tried, and we should have had an opportunity to rebut and avoid the alleged possession, by producing the facts stated in the bill, and other evidence, proving that the defendant has had no such possession as can give any aid or countenance to the two agreements which she relies upon, and which we impeach. But no such trial upon the question of possession can be had under the present question as to the sufficiency of the plea; and I can only refer to the facts charged in the bill, for the purpose of showing the insufficiency of the plea in not having met and responded to those facts, so that they might have been put in issue and tried. The bill, after pointing out the imposition or erroneous belief under which the Roxbury and Rehoboth agreements had been signed by the committees; states that the error or mistake thus committed, and the wrong thereby done to Rhode Island, were not discovered until an actual survey of the premises was made in 1749, 1750, by which the true charter line was ascertained. That from that time Rhode Island never ceased to assert her claim, or to deny the right of Massachusetts to the possession of the territory of which she had wrongfully got possession. That the Rhode Island legislature had, time after time, appointed, and continued, committees, for the purpose of effecting a settlement of the dispute with Massachusetts, and had constantly urged that colony, and afterwards state, to appoint committees on her part for the same purpose; which had been done by Massachusetts, and many con-

ferences upon the subject of the existing misunderstanding had been held by those committees from the year 1750, and continued to be held up to a recent date.   But without producing any good effect: except in the year 1791, when the committees from the two states, not being able to agree upon the main subject, did agree to recommend to their respective governments to refer the matter in dispute to indifferent men of other states, or to Congress, to settle the same agreeably to the respective charters; the Massachusetts committee being satisfied that nothing binding on either party had as yet been done.   That some time after the committees appointed by the two colonies in 1749, 1750, had failed to effect a settlement, Rhode Island prepared to prosecute her claim before the king in council.   "But that, being then thinly populated, and her resources very limited, and the war with France having soon after broken out, by which her attention was directed to other objects, and her resources exhausted; her endeavours to obtain a settlement of the line, according to her charter, were ineffectual; and that her efforts to effect that object were again suspended by the war of the revolution.   But that towards the end of that war, in 1782, upon the petition of a large number of the inhabitants residing on the disputed territory, claiming of right to belong to Rhode Island; the legislature again appointed a committee who reported in favour of said claim."

Besides these, there are other material facts and circumstances to the same effect, which, whenever the question of the alleged possession by Massachusetts shall be tried, will conclusively prove, that from the year 1748, 1749, when the error in the boundary line was first discovered, Rhode Island has never, for a moment, acquiesced in the justice of that possession, but has constantly denied it, and demanded restitution; and that the character of that possession has not been such as to give any consistency or validity to the pretended agreements of 1710, 1711, and 1718, or either of them. But, as that question of possession is not now on trial; I presume that the references I have made to the charges in the bill, upon this head, are enough to support our objection to the plea and answer for insufficiency, in not having in any way negatived, met, or responded to a single one of those charges.   I may, however, be allowed to remark, that, undoubtedly, Rhode Island was always very reluctant to engage in a conflict with her powerful neighbour. And it is apparent, that the part which Massachusetts herself acted, from the time that the error was discovered in 1749, was the chief cause that Rhode Island did not sooner adopt stronger measures for enforcing her right.   For, the committees which Massachusetts continued to appoint and keep up, although they parried the claim of Rhode Island, yet, by temporizing with her committees, and leading them along from period to period, they encouraged the expectation that an equitable settlement might finally be effected.   And certainly Rhode Island had a right to indulge in this expectation, particularly after the year 1791, when the Massachusetts committee

itself recommended the appointment of impartial referees to settle the line according to the charters; which they were satisfied had not been done, but ought to be done.

· It ought to be recollected also, that, during all that period, the same controversy existed, and was carried on between Massachusetts and Connecticut. The two complainant states co-operated together, particularly in the measures taken to bring their complaints before the king in council. Connecticut was the larger and more influential colony; and Rhode Island very properly expected her to take the lead in the common cause, relying upon her efforts to bring Massachusetts to justice. But during all that period there was never any acquiescence by Rhode Island any more than by Connecticut, in the wrongful possession of Massachusetts; both colonies, or states, equally and constantly protested against that wrongful possession, and demanded restitution. It was not until the year 1804, that Connecticut brought Massachusetts to terms: and certainly, when that was done, Rhode Island had good reason to hope that her claims (resting upon the same basis as those of Connecticut,) would also be listened to, and her rights respected by Massachusetts. And accordingly, committees were soon afterwards appointed by the two states to make a settlement between them. And those committees continued their conferences until no long time before the commencement of this suit. Clearly, Massachusetts had as good a pretence for setting up her long possession against Connecticut, as she can now have for setting it up against Rhode Island: and better; for the agreement made in 1713, by their committees, adopting the same pretended Woodward and Saffrey station, as did the Roxbury committees in our case; that agreement was confirmed and ratified by solemn acts of both governments. But Connecticut would not consent, that a possession, wrongful in its commencement and continuance, and always protested against, should be used to support an agreement obtained by unfair means, and under which that possession had been unjustly held. And Massachusetts acquiesced in the objection, and abandoned the pretence of possession. Can she now revive the same pretence against the other copartner state; with whom she had, at the same time, precisely the same controversy.

The counsel has dwelt and laboured upon this allegation of possession, as if the mere fact of possession was the only thing he had to establish. And has read a part of our bill to show that that fact is admitted by the plaintiff; and this, he thinks, settles the whole matter: keeping out of sight the facts charged by way of replication, in the bill, (in conformity to the practice in equity,) in avoidance of the admitted possession, showing that the alleged possession was unfairly obtained, had been unjustly continued, and always protested against. This is the incurable defect of the plea itself. It tenders no issue upon the only facts upon which an issue can be taken. The fact of possession being admitted by the replication, makes no part of the issue to be joined. The facts charged in avoid-

ance of that possession, are the only facts to be put in issue, so far as possession makes part of the bar matter pleaded. As well might a defendant who pleads a release in bar, to which the plaintiff replies, admitting the execution of the release, but charging that it had been obtained by fraud; as well might the defendant refuse to have any trial upon the charge of fraud, and still insist upon his naked release, because the execution of it is admitted

It has been asserted that Rhode Island was never, for a single moment, in possession of the territory in question. This is saying too much. When the Rhode Islanders were driven from Massachusetts because they were Baptists and Quakers, they purchased of the native proprietors, and honestly paid for that part of the Narraganset's country which was beyond the jurisdiction of the hostile colony; and there they colonized and took possession of the country in 1635, 1636. In 1643, they obtained their first charter, and their last in 1663; confirming their purchase from the native proprietors, and erecting them into a colony, bounded north on the charter line of Massachusetts colony. If certain persons (whatever their names) did go into the wilderness in 1642, and did, somewhere or other, set up a stake, and leave it standing, that act did not interfere with the rights of anybody. If the Massachusetts colony had any agency in that, (which no how appears, nor is alleged in the plea,) she certainly did not pretend to take any possession adversely to the king or the king's grant to Rhode Island. Rhode Island, therefore, was clearly in possession, at least down to 1710, 1711, the date of the agreement between Dudley and Jenckes; as to the possession which Massachusetts then obtained, how she obtained and how retained it, I have already sufficiently commented upon; more than sufficiently, for the purposes of this argument upon the sufficiency of the defendant's plea.

Sundry passages have been read from Vattel, to show the sacred character of treaties and compacts between sovereigns. Who ever doubted so self-evident a proposition? But what are those treaties and compacts which are so obligatory? They are such as are just and unimpeachable; executed fairly and freely; without suggestio falsi, or suppressio veri; free from the charge of imposition, or undue practice, or unjust advantage. Is there any thing to be found in Vattel, that enjoins the observance of a compact of a different character from this; much more the confirmation of such a compact when made by agents acting under a gross mistake of facts? I am unable to comprehend the doctrine which would apply different rules and principles of justice to the conduct of sovereigns, and to that of individuals. Justice herself knows no such distinction.

The counsel has intimated, that the habits and feelings of the inhabitants of that district, would revolt at being included within the limits of Rhode Island. He speaks without authority, and is wholly mistaken. Some years ago a large and respectable portion of those inhabitants, in a memorial to the legislature of Rhode

x 2

Island, claimed to belong to that state; and solicited the legislature to enforce their right. I am fully warranted in saying, that the mass of those inhabitants still entertain the same opinions and wishes.

Mr. Webster, for the State of Massachusetts.

The colonial grant of James the First of England, of the Plymouth colony, was on the 3d of November, 1621. The grant was for all the lands lying between the fortieth and forty-eighth degrees of north latitude, extending westwardly from the ocean. On the 19th of March, 1628, the council of Plymouth made a grant to the Massachusetts settlers, of the territory destined to form the colony of Massachusetts. This grant was of all the lands lying between the Merrimac river on the north, and three miles south of Charles river, from the Atlantic or Western Ocean, on the east part, to the South Sea, on the west part. This grant was confirmed by Charles the First.

The description of the territory is first found in the grant of the council of Plymouth to Massachusetts. Charles river was so called after 1625, and before 1628. At that time, there was not a white man in Massachusetts. It is a very important fact, and lies at the foundation of the question, in this case, that at the period referred to, the boundary three miles south of Charles river, was fixed when that river had never been ascended by the colonists three miles from its mouth. The first settlement made by the colonists was in Salem. It was made by Governor Endicott. Boston was not settled until 1630; and until that year Charles river was never ascended.

The facts stated in the plea, and which are admitted by the complainants, are, that in 1642, Woodward and Saffrey's monument was set up, to establish a south line for Massachusetts. This is clearly and distinctly stated in the early part of the plea.

This brings us to the fact, that fifteen years after the settlement of Massachusetts, the monument was established, and was known, and notorious. This was the position established for the boundary line of the colony; and it is important to ask, if, by this line, Massachusetts encroached on territory, not a part of her territory, on whose territory did she encroach? Not on that of Rhode Island; for the colony of Rhode Island did not then exist. She must have encroached on the territory of the crown of England. This state of things remained until 1663, when the colony of Rhode Island was established.

Charles the Second did not grant the territory which composed the colony of Rhode Island by metes and bonds; other than declaring the north line of the colony to be "on the north, or northerly by the south or southerly line of Massachusetts plantations."

The colonies established by those grants did not hold under the King of England. The language of the grants, in express terms, excluded this. They were grants in "free and common socage." When Rhode Island received her territory by the grant, she received it bounded by the southwardly line of Massachusetts. This was an

acknowledgment of the boundary. Now, after the elapse of one hundred and ninety-eight years of full and uninterrupted possession by Massachusetts; as a colony until 1776, and as a state up to the present period; she seeks to drive Massachusetts back from this line; and to take from her sovereignty and dominion over three miles of territory.

Why is this effort made? Why is this disturbance of the quiet and unmolested possession by citizens of Massachusetts, claimed? Not because Rhode Island has a boundary different from that by which she has hitherto been restrained. She had no rights, when the colony was established, other than to the line now existing between the two states. All she has of boundary or of territory, are, by the express terms of her grant, secondary to those of Massachusetts. She goes up to the southerly line of Massachusetts; and there she must stop, now, as heretofore.

The case presented to the Court, on the bill and answer, is that of a second grantee, taking his boundary from a prior grant; and who, after the elapse of one hundred and ninety-eight years, seeks to disturb the line so long existing and recognised between the prior grantee and himself.

On what ground is this attempt made? It is said, the boundary was fixed by mistake. But the state of Massachusetts does not acknowledge any mistake; unless it is found in the fact, that her true southern boundary, if it had been correctly run, would be yet more south than that fixed by the Woodward and Saffrey station. Going higher up Charles river, a point far south of that station could have been found; which would have fully answered the boundary described in the colonial grant, of a line three miles south of Charles river.

How is it sought to maintain the position that the Woodward and Saffrey station is more than three miles south of Charles river? It is said that "Mill brook" and "Whiting's pond" are not parts of Charles river.

It is important to bear in mind, as has been stated, that when the station was fixed, but little of Charles river was known. The object of the grant was to give to the colonists the benefit of all the waters of Charles river; and the station was fixed in this view of the subject. "Mill brook" and "Whiting's pond" formed branches of the river, as was then understood, and has ever since been so considered. The question now before the Court is identical with that which now disturbs the harmony of the United States and England; as to the northern boundary of the state of Maine.

The question before the Court is brought under the provisions of the Constitution of the United States. By what code of laws is it to be decided?

There were no provisions in the articles of confederation, nor are there any in the Constitution of the United States, prescribing the modes or rules of proceeding in such a case; nor are there any laws of the land, or rules of Court to regulate such a procedure, except

as to the notice of the institution of the suit. In the history of the world, there is no account of a similar proceeding in any Court of judicature. No adjudication of such a controversy is known in any Court of the world. If any determination of the case is to be made, it must be under the law of nations.

Will this Court consider the case as one between individuals; a question of contract; and to be considered by the Court with a view to enforce the contract, as if it were between two citizens or two individuals, parties to the controversy? No state in the Union would submit to such a view of the case. Its rights, as a sovereign state, are deeply involved in this question. The rights of the citizens to the government under which they were born; to the laws which they have assisted to make; and under which they have always lived, and desire still to live; under which they have acquired and hold their property; are to be submitted to the Court.

The bill filed by the state of Rhode Island calls on the Court to change the allegiance of a large number of the citizens of Massachusetts; to oblige them to submit to a different body of laws than those which, by their own choice, have heretofore governed them: to dismember a state: and this on the ground that, nearly two hundred years ago a mistake was made in fixing the boundary line between the two contending sovereignties. A possession of one hundred and ninety-eight years is thus to be disregarded; and all the rights of citizenship, all the rights of property, all the affections of the people to the state of their birth, education, and prosperity, are to be set aside.

No complaint is made that the controversy between the parties to this case is presented by a bill in equity. It was proper to do so; but this does not change the rules by which the case is to be decided. A Court of Equity restores the consideration which has been paid by a party to a contract, when it rescinds the contract. Will this Court break up the compromise which was made by Massachusetts with Rhode Island; and return to Massachusetts the one mile of her territory which was given by her to Rhode Island when the compromise was made?

This case must be discussed and settled upon principles which will have the sanction of the whole civilized community. What can be more extraordinary and unusual, than an attempt, after the elapse of one hundred and ninety-eight years, to open a question on the ground of a mistake by the parties who had at that long by-gone day adjusted the controversy; in which adjustment, the mistake is alleged to have been made. Lewis the Fourteenth broke a treaty solemnly made, on the ground of a mistake in the negotiators of the treaty; and all Europe was involved in war. The remarks of Voltaire on this act of the King of France, will apply to the attempt made in the case before this Court, by the state of Rhode Island.

The state of Massachusetts has a right to call upon the complainants for a case, in which a natural and ascertained boundary, known and acted upon for so long a period, has been disturbed. Look at

the question presented for the consideration of the Court by the agreements between the commissioners of the two colonies, while they were colonies; and which had the acquiescence of the legislatures of both the parties. These are all stated in the plea. It is alleged by Massachusetts that there is a boundary between her and Rhode Island, of one hundred and ninety-eight years' standing; that this boundary was established by competent persons in 1710, and again in 1717; and from 1710, to the present time, Massachusetts, as a colony and as a sovereign state, has held the territory now claimed from her. Can a better reason against the removal or change of a boundary be given by any state?

Is not this a good diplomatic answer to the claim of the state of Rhode Island? One sovereign and independent state asks territory from another state, of equal rank with herself. She is met by the fact that the territory asked has been in possession of the state from which she asks its surrender, for nearly two hundred years. This should settle the question between the states. Established boundaries for one hundred years would not be disturbed between nations, with the consent of other nations.

What was the mistake asserted to have been made by the commissioners of Rhode Island? It is said they were misinformed as to the distance of Woodward and Saffrey's station from Charles river. It is admitted by the complainant, that the commissioners of Massachusetts acted in good faith: and yet the agreement is to be cancelled.

Fraud, actual fraud, would not set aside an agreement, after so much time had elapsed. If a party has slept on his case, or has suffered others to act under the belief that the subject was fully and finally arranged, Courts of Equity would not interfere after nearly two centuries had gone by; and property had been acquired, civil rights asserted, and undisturbed, during the whole of that long period. Although no attempt is made to change or affect the tenures of property, the civil rights of thousands are to be changed, and transferred to another government to which they are strangers.

Again an authority for the grant, by the Court, of the object of the complainant's bill, is asked for. Where is the case in which such relief has been sought? Where is the instance in which it has been given? It is true, that on the application of Rhode Island, commissioners have at different times been appointed by Massachusetts, and those commissioners have met with commissioners appointed on her part. This is a proper course of proceeding between states. A sovereign state must be heard, whatever may be the subject of her complaint. Subjects in controversy between states are not to be settled without delays and grave consideration. Respect is always to be given to applications by states to other political communities. But with all this courtesy and just regard to the dignity, and just right of the state of Rhode Island to be respected, the state of Massachusetts has never receded from the line established by the Woodward and Saffrey station. Those acts of conciliation and

international civility, do not affect the agreements of 1710 and 1721; it being admitted that the possession of Massachusetts is in exact harmony with them.

Thus, in international law, the case is against Rhode Island.

But we are willing to consider the case, as one to be decided by the rules of Equity pleadings.

The complainant's bill would have been bad on a demurrer, in a Court of Equity; because it sets out a bar to the defendant's case, and does not set out sufficient to destroy it. Possession, in a Court of Equity, is as certain a title to land, as in a Court of Law. It is now held that a party may defend himself in equity by possession, as well as at law. Elmondorf vs. Taylor, 10 Wheat. 152. 6 Cond. Rep. 47.

It is to be considered by the Court that every thing stated in the plea is true. This is the necessary consequence of the position in which the complainant is placed, by the effort he now makes to show the Court the plea is insufficient.

It is admitted, the agreements between Rhode Island and Massachusetts of 1710 and 1721, were fair, and were made with full knowledge of the subject of the agreements, or with a full opportunity to obtain such knowledge. Possession accompanied those agreements, and was entirely consistent with them; and they have never been rescinded or abandoned.

This brings back the argument to the question of mistake. It is said that the plea shuts out Rhode Island from her proof. But Rhode Island can prove nothing more than she has stated in her bill. Take all that is stated in the bill to be true; and Massachusetts alleges it is not sufficient to set aside the agreements.

This Court cannot know more than the commissioners on behalf of Rhode Island, and on behalf of Massachusetts, knew in 1710. The ground of the assertion of mistake is not sufficient to open the controversy.

Can controversies be never settled when parties say there has been a mistake? 2 Powell on Contracts, 90. The unreasonableness of a contract is not a ground to set it aside.

Another well established principle is, that when a thing is doubtful and uncertain, a settlement between the parties is conclusive. Powell on Contracts, 125. 1 Ves. Sen. 408. 1 Story's Equity, 163. 1 Mad. Chan. Pract. 62, 63.

It is said the defendant has not answered the bill: but this is the very question before the Court. The plea and answer of the defendant are now under examination; and it will be for the Court to decide upon their sufficiency, and whether they will sustain the defendant's claim to be dismissed from any further action in the case. If the party had deemed the plea insufficient, he might have excepted to it, and have brought in other matter. This he has not done; but he asks the Court to decide on the insufficiency of the plea and answer. This is altogether irregular. 1 Story's Equity, 528, sect. 684. Mitford's Pleading, 200. Beames' Equity, 248. 1 Vernon's Rep. 185.

Cooper's Equity, 284.   5 Mad. Rep. 328, 330.   Adams *vs.* Thrope, 4 Johns. Ch. Rep.

What is it that the defendant should have denied?   The rule of a Court of Equity is, that the plea or answer should deny the final result of all the allegations; not each particular matter which may in itself be true.   The permission which is given to the defendant to deny the whole charge of the bill, is essential to the existence and validity of a plea in bar.   Beames' Equity, 37.   5 Brown's Parl. Cases, 552.   Gilbert's Equity, 184.   Cooper's Equity, 328.

There must be something not denied by the plea, upon which the Court can give a decree for the plaintiff.   If there is not enough left undenied, sufficient to make a case for relief or recovery, none can be granted.   The plaintiff might allege twenty facts, either quite immaterial, or even, perhaps, material in some degree, or as matter of evidence, which the defendant could not deny.   For instance, the complainant avers that Dudley and Jenckes did not go on the ground to examine it.   The defendants are not obliged to deny that; for the agreement may be good, if fair, though the fact were as is averred. So the bill avers the discontent of Rhode Island; an ex parte line having been determined upon.   That may be so; but that does not set aside the agreement.   Massachusetts, it is asserted, appointed commissioners to meet commissioners appointed by Rhode Island. That may be so; but the agreement was in full operation.

Every thing alleged to have happened after 1719 is called for, for the purpose of proving some waver, recession, or abandonment of the agreement.   If that were not the design, it had no object.

Now the plea meets and denies the general fact, which all these things are said to prove.   Denying the general fact, we need not deny each of the circumstances relied upon as proof.

There is a difference in this respect between the case now before the Court, and a case where fraud is charged.   Any fraud, little or great, vitiates: every mistake does not.   Any one circumstance amounting to fraud, proves fraud.

Suppose the complainant had charged, in direct terms, an abandonment of the agreement of 1710: it would have been enough for the defendant to have denied the abandonment in general terms.

Mr. Chief Justice TANEY delivered the opinion of the Court.

When this case was last before the Court, Massachusetts had not made her election, whether she would continue her appearance to the suit, or withdraw it according to the leave previously granted. She has since that time made her election, by putting in her plea to the amended bill of the complainant; and both parties are now regularly before the Court.

In the present stage of the case, the question is upon the sufficiency of the plea, as a bar to the relief sought by the complainant's bill.   The object of the bill is to establish the boundary between the two states, according to their respective charters; and to be restored to the right of jurisdiction and sovereignty over that portion of her

territory of which she alleges that Massachusetts has unjustly deprived her.

The bill states the various charters from the crown to the colonies of Massachusetts and Rhode Island, from 1621, to 1691; and avers that, by virtue of the charter of Rhode Island, the boundary between her and Massachusetts was a line run east, and west, three miles south of Charles river, or any or every part thereof; that the place of the said line being unsettled and in dispute between the two colonies, commissioners were mutually appointed to ascertain and settle it; that these commissioners met in 1710; and that the commissioners of Massachusetts then represented that a certain Nathaniel Woodward and Solomon Saffrey had, a long time before, ascertained the point three miles south of Charles river, and had set up a stake there; and that the commissioners of Rhode Island, relying on these representations, and believing them to be true, entered into the agreement of 1710, which is recited at large in the bill; and which adopts the place marked by Woodward and Saffrey, as the commencement of the line between Massachusetts and Rhode Island.

The bill further states, that no mark, stake, or monument at that time existed; and that the persons who consented to the pretended agreement, did not go to the place where it was alleged to have been set up, nor make any survey, nor take any measures, to ascertain whether the place was, in fact, three miles, and no more, south of Charles river.

That the said agreement was never assented to or ratified by the colony or the state of Rhode Island; and that the tract of one mile in breadth, referred to in the agreement, was never conveyed to or enjoyed by the town of Providence, or the colony of Rhode Island; and that no persons appointed by the governor and council of the said two governments of Massachusetts and Rhode Island, within the space of six months from the date of the agreement, or at any other time, showed the line of Woodward and Saffrey, or raised or renewed any marks, stakes, or other memorials, according to the terms of the said pretended agreement.

The bill then proceeds to state the continuance of the controversy about the boundary, and the appointment of commissioners by both colonies, in 1717 and 1718; that they met in 1718, and that the like representations, as those charged to have taken place at the former meeting of the commissioners, were again made by the commissioners of Massachusetts; that they were again believed by the commissioners of Rhode Island; and the agreement of the 22d of October, 1718, executed by them under that mistake. This agreement is set out at length. The complainants aver that the commissioners did not go to the place where the stake was alleged to have been set up, or make any survey in relation to this agreement. These averments are, in substance, the same with those made in relation to the agreement of 1710. The bill then sets out an order of the General Assembly of Rhode Island, directing the return of the commissioners

to be accepted and placed to record on the colony book; but the complainants aver that the last mentioned agreement was never ratified by either Rhode Island or Massachusetts.

The bill then sets out the running of the line, under the belief on the part of the Rhode Island commissioners, that it was only three miles south of Charles river, when it was in fact more than seven; sets out, at large, their report of the running, which is dated May 14, 1719, and that the return was approved by the General Assembly of Rhode Island; but the bill avers that the persons who signed that report, were never authorized by Rhode Island to run, agree upon, or report said line, and had no legal authority to act in the premises; and that Massachusetts, about the time last mentioned, wrongfully possessed herself of the disputed territory, and has held it ever since.

The bill further states, that the line run as aforesaid was never established by any act binding upon the complainant; on the contrary, she has always claimed that the true dividing line was three miles south of Charles river : that she has never acquiesced in the claim of Massachusetts to a different line; and that the claim of Rhode Island was publicly and frequently urged by the colony, and by the freemen and inhabitants thereof; that all the proceedings of Rhode Island before mentioned, were founded on the mistaken belief that the stake set up by Woodward and Saffrey, and the line run as aforesaid, was only three miles south of Charles river; that this mistaken belief continued until about 1749; that controversies existing during that period between the citizens of the two colonies in relation to the boundary, Rhode Island, in the year last mentioned, appointed certain persons to run the line, when it became manifest that the line run as above mentioned in 1719, was more than three miles south of Charles river.

The bill then states the negotiations and other proceedings of the two colonies in relation to this boundary; that commissioners were appointed on both sides to run the line; that it was actually run, as now claimed by the complainant, by the commissioners of Rhode Island, in the absence of the commissioners of Massachusetts; who refused to attend. All of these things are particularly set out in the bill; and also that Rhode Island attempted to obtain the decision of the king in council; and the failure is accounted for by the poverty of the colony at that time, and the war which shortly afterwards broke out between France and England; that the war of the Revolution, which soon followed, interrupted and defeated the attempt to obtain the decision of the king in council; that in 1782, the legislature of Rhode Island again took up the subject, and appointed a committee, who reported in favour of the claim now made by the complainant; that in 1791, the two states mutually appointed commissioners to adjust this boundary, who met together in that year; and at that meeting, the commissioners on the part of Massachusetts acknowledged, and also set forth in their report subsequently made to the legislature, that the pretended agreement of 1719, herein before mentioned, had never been ratified either by Massachusetts

or Rhode Island, which report was accepted by the legislature; that the commissioners of the two states, being unable to agree upon the boundary, entered into a written agreement, which is set out in the bill, recommending to the two states to submit the matter to indifferent men of the neighbouring states; or to unite in an application to Congress to settle the same agreeably to the respective charters, and the Constitution of the United States; that the said commissioners, in 1792, reported their proceedings to their respective states, and the agreement made by them as aforesaid; which said reports were received and accepted by the legislatures of Massachusetts and Rhode Island, the one made to Massachusetts being set out at large, as an exhibit to complainant's bill; that other commissioners were afterwards appointed on both sides, and were continued until the year 1818; that they had several meetings, but were unable to agree upon and settle the line.

The bill then charges that Massachusetts has wrongfully continued to hold possession, and exercise jurisdiction within the charter boundary of Rhode Island; that the agreements of 1710, and 1718, were unfair and inequitable, and executed by mistake, as before mentioned; that the line as run, is not in a west course from the place of beginning, but is south of a west course, thus taking in a part of Rhode Island, even according to the point alleged to have been ascertained and marked by Woodward and Saffrey; that the agreements of 1710, and 1718, herein before mentioned, were never ratified by Massachusetts or Rhode Island; and if they had been so ratified by the colonies, they would not have been binding without the consent of the king in council, which was never given to either of them.

And the bill concludes with an averment that Rhode Island has uniformly resisted the claim of Massachusetts; has never claimed or admitted any other boundary than the one according to the charter; and prays for an answer to all the matters charged, and to sundry special interrogatories put in the bill: and that the northern boundary of the state may be ascertained and established, and Rhode Island restored to the exercise and enjoyment of her rights of jurisdiction and sovereignty, over the territory to which she is entitled by her charter limits.

To this bill Massachusetts has put in her plea and answer; in which she sets forth, that in the year 1642, for the purpose of ascertaining and establishing her true southern boundary, a station, or monument was erected at a point then believed to be on the true and real boundary line of the said colony, and a line continued therefrom westwardly to Connecticut river; that the said station or monument then became, and ever since has been well known and notorious, and then was and ever since has been called Woodward and Saffrey's station; that Massachusetts afterwards held and possessed jurisdiction up to this line, and while she so held and possessed it, about the year 1709, a dispute arose between the two governments of Massachusetts and Rhode Island, respecting this

boundary line, and commissioners were appointed by both colonies to settle it; and that whatever they should agree upon, should forever after be taken to be the stated lines and bounds; that the commissioners met, pursuant to their authority, and entered into the agreement of 1710, which is set out at large.

The plea then avers, that the whole merits of the complainant's claim, was heard, tried, and determined by this judgment and agreement of the commissioners; that the agreement was fair, legal, and binding between the parties; and was in all respects a valid and effectual settlement of the matter in controversy; and was had and made without fraud, covin, or misrepresentation, and with a full and equal knowledge of all the circumstances by both parties; and that the same is still in full force, no way waived, abandoned, or relinquished; that Woodward and Saffrey's station was then well known, and the place where it was fixed a matter of common notoriety; and the line run therefrom capable of being shown and ascertained, and the marks, stakes, and memorials there, are easily capable of being discovered and renewed; and that the defendant has held and possessed the land, property, and jurisdiction, according to the said station and the line running therefrom, from the date of the said agreement to the present time; without hinderance or molestation. The plea then sets forth the proceedings of Massachusetts and Rhode Island, in 1717, appointing commissioners to settle the boundary; the meeting of these commissioners, and their agreement in 1718, which is set out at large in the plea; and which the defendant avers was accepted by Rhode Island, and caused to be duly recorded, and that the same was thereby ratified and confirmed.

The plea further avers, that no false representations were made on this occasion by the commissioners of Massachusetts; that the agreement was concluded in good faith, with a full and equal knowledge of all the circumstances, by the respective parties; and that the same has never been rescinded or abandoned; that it was made in pursuance of the first agreement before mentioned, in 1709, and in completion thereof; the plea then sets out at large, the report made by the commissioners in 1719, stating the manner in which the line was run; and avers that the report was approved by the General Assembly of Rhode Island, on the 16th of June, 1719; and that from the date of said agreement to the present time, Massachusetts has possessed all the territory, and exercised jurisdiction over the same, north of the said line, as prescribed in the said agreements of October, 1718, without hinderance or molestation.

The plea then says: "And the said defendant doth plead the said agreement of January 19th, 1710; and the said agreement in pursuance and confirmation thereof of the 22d of October, 1718, and unmolested possession according to the same from the date of the said agreements, in bar to the whole bill of complaint of the said complainant, and against any other or further relief therein; and doth pray the judgment of the Court, whether the said defend-

ant ought further to answer the said bill, and that said defendant may be dismissed with costs in this behalf sustained."

Then follows an answer in support of the plea, which it is unnecessary to repeat. The plea was set down for argument upon the motion of the complainant; and the question now to be decided is, whether this plea is a bar to the complainant's bill.

In the view we have taken of the subject, it has become necessary to set out, in much detail, the contents both of the bill and the plea, in order to show the principles on which the opinion of the Court is founded. The controversy concerns, altogether, the southern boundary of Massachusetts, and the northern boundary of Rhode Island. The bill sets out the judgment given in 1684, in the Court of Chancery of England, declaring the original charter of Massachusetts to be vacated, and that the enrolment of the same should be cancelled; and also sets forth the letters patent afterwards granted to Massachusetts by William and Mary, in 1691, which was subsequent to the charter of Rhode Island. How far this fact may or may not be material, it would not be proper for us now to inquire. We advert to it merely to show the character of the controversy. The complainant insists in her bill, that Massachusetts has encroached upon her; and instead of coming three miles south of Charles river, for the southern line, the one to which she claims and holds is more than seven. The defendant, it will be observed, does not, in her plea, deny that the charter line of Massachusetts is such as the complainant describes; nor does the defendant deny, that the line to which Massachusetts now holds, and to which she insists that she has a right to hold, is four miles further south than that described in the charter; but she relies upon the circumstances set forth in her plea and answer, as conclusive proofs of her right, as against the complainant, at this time, whatever may have been the true boundary line between them according to the terms of the original charters.

The case to be determined is one of peculiar character, and altogether unknown in the ordinary course of judicial proceedings. It is a question of boundary between two sovereign states, litigated in a Court of justice; and we have no precedents to guide us in the forms and modes of proceeding, by which a controversy of this description can most conveniently, and with justice to the parties, be brought to a final hearing. The subject was however fully considered at January term, 1838, when a motion was made by the defendant to dismiss this bill. Upon that occasion the Court determined to frame their proceedings according to those which had been adopted in the English Courts, in cases most analogous to this, where the boundaries of great political bodies had been brought into question. And acting upon this principle, it was then decided, that the rules and practice of the Court of Chancery should govern in conducting this suit to a final issue. The reasoning upon which that decision was founded, is fully stated in the opinion then delivered;

and upon re-examining the subject, we are quite satisfied as to the correctness of this decision.    12 Peters, 735. 739.

The proceedings in this case will therefore be regulated by the rules and usages of the Court of Chancery.    Yet, in a controversy where two sovereign states are contesting the boundary between them, it will be the duty of the Court to mould the rules of Chancery practice and pleading, in such a manner as to bring this case to a final hearing on its real merits.    It is too important in its character, and the interests concerned too great, to be decided upon the mere technical principles of Chancery pleading.    And if it appears that the plea put in by the defendant may in any degree embarrass the complainant in bringing out the proofs of her claim, on which she relies, the case ought not to be disposed of on such an issue.    Undoubtedly the defendant must have the full benefit of the defence which the plea discloses; but at the same time, the proceedings ought to be so ordered as to give the complainant a full hearing upon the whole of her case.    In ordinary cases between individuals, the Court of Chancery has always exercised an equitable discretion in relation to its rules of pleading, whenever it has been found necessary to do so for the purposes of justice.    And in a case like the present, the most liberal principles of practice and pleading ought unquestionably to be adopted, in order to enable both parties to present their respective claims in their full strength.

According to the rules of pleading in the Chancery Court, if the plea is unexceptionable in its form and character, the complainant must either set it down for argument, or he must reply to it, and put in issue the facts relied on in the plea.    If he elects to proceed in the manner first mentioned, and sets down the plea for argument, he then admit: 'he truth of all the facts stated in the plea, and merely denies their sufficiency in point of law to prevent his recovery.    If, on the other hand, he replies to the plea, and denies the truth of the facts therein stated, he then admits that if the particular facts stated in the plea are true, they are then sufficient in law to bar his recovery: and if they are proved to be true, the bill must be dismissed, without reference to the equity arising from any other facts stated, in the bill.    6 Wheat. 472.    Undoubtedly, if a plea upon argument is ruled to be sufficient in law to bar the recovery of the complainant, the Court of Chancery would, according to its uniform practice, allow him to amend; and to put in issue, by a proper replication, the truth of the facts stated in the plea.    But in either case, the controversy would turn altogether upon the facts stated in the plea, if the plea is permitted to stand.    It is the strict and technical character of these rules of pleading, and the danger of injustice often arising from them, which has given rise to the equitable discretion always exercised by the Court of Chancery in relation to pleas.    In many cases, where they are not overruled, the Court will not permit them to have the full effect of a plea; and will in some cases save to the defendant the benefit of it at the hearing; and in others

Y 2                33

will order it to stand for an answer, as in the judgment of the Court may best subserve the purposes of justice.

In the opinion of this Court, it was evident from the argument we have heard, that if the plea stands, the case must be finally disposed of, upon an issue highly disadvantageous to Rhode Island. For by setting down the plea for argument, that state is compelled to admit the truth of all the facts stated in it, many of which are directly at variance with the allegations contained in the bill. Thus, for example, the complainant avers, that the persons who signed, in her behalf, the agreement of May 14th, 1719, had no legal authority to act in the premises. In the plea and answer of the defendant, it is averred that they had authority. The bill charges, that the Rhode Island commissioners acted under a mistake; that the commissioners of Massachusetts represented to them that the stake set up by Woodward and Saffrey was only three miles south of Charles river; and that they believed the representation, and acted upon it, when in truth the stake was seven miles south of that river. The plea on the contrary avers, that the agreement was made with a full and equal knowledge of all the circumstances by the respective parties. There are differences also between the bill and the plea, in relation to the nature and character of the possession held by Massachusetts, of the disputed territory.

If we proceed to decide the case upon the plea, we must assume, without any proof on either side, that the facts above mentioned are correctly stated in the plea, and incorrectly set forth in the bill. This is the rule of the Chancery law. Yet it is evident, that by deciding the case upon such an issue, we should shut out the very gist of the complainant's case; and exclude the facts upon which her whole equity is founded, if she has any. Because, if we assume, as we must do in this state of the pleading, that the agreements, which are admitted on both sides to have been made, were made by persons having competent authority to make them, and who had full knowledge of all the circumstances; and that Massachusetts had quietly and peaceably enjoyed the territory, under this agreement, for more than a century; every one, we presume, would admit that the claim of Rhode Island to unsettle this boundary, at this late day, was utterly groundless and untenable. Yet this is the attitude in which Rhode Island must stand upon the issue framed by the plea; the allegations in her bill, above mentioned, must be rejected as erroneous, without giving her an opportunity of proving them; and her claim to this territory must be decided, upon a statement of facts, the truth of which she utterly denies, and which she offers to prove are entirely erroneous, if the Court will consent to hear her testimony. We do not mean to say that the facts stated in the bill, if proved to be true, will entitle the complainant to recover. That point is not before us in the present state of the pleadings; and we give no opinion on the merits of this controversy. But certainly it would be unjust to the complainant not to give her an opportunity of being

heard, according to the real state of the case between the parties; and to shut out from consideration the very facts upon which she relies to maintain her suit.

If the complainant takes issue on the facts stated in the plea, her condition would be equally unfavourable. For there are many facts upon which the complainant evidently relies as material, which are altogether unnoticed in the plea, and upon which, therefore, no issue would be framed. And if the complainant were to adopt this alternative, she would admit, according to the Chancery rules of pleading, that all of the allegations contained in her bill were immaterial and of no importance, except those noticed in the plea: and that if the facts averred in the plea turned out to be true, the complainant had no right to recover, whatever equities might be found in the other allegations in the bill; and whatever proofs she might be ready to adduce in support of these allegations.

In either alternative, therefore, it would be manifestly unjust to the complainant, to decide this controversy upon the plea; and if it was deemed good in form and substance, so far as the case is already presented to the Court, we still should not finally decide the controversy on this plea, but save the benefit of it to the hearing, and give the complainant as well as the defendant, the opportunity of bringing forward all the merits of his case. But the plea put in by the defendant cannot be sustained, even if this were to be treated as a suit between individuals, and tried by the ordinary rules of Chancery pleading. It is multifarious, and on that account ought to be overruled.

It is a general rule, that a plea ought not to contain more defences than one. Various facts, therefore, can never be pleaded in one plea; unless they are all conducive to a single point, on which the defendant means to rest his defence. This principle is so well established, that it is unnecessary to refer to many adjudged cases to support it. It is fully stated by Lord Hardwicke, in 1 Atk. 54, in the following words: " The defence proper for a plea, must be such as reduces the cause to a particular point, and from thence creates a bar to the suit, and is to save the parties expense in examination; and it is not every good defence in equity that is likewise good as a plea; for where the defence consists of a variety of circumstances, there is no use of a plea, the examination must still be at large, and the effect of allowing such a plea, will be, that the Court will give their judgment on the circumstances of the case, before they are made out by proof."

The defendant, after stating the various proceedings herein before mentioned, which preceded and followed the execution of the agreements on which he relies, all of which conduce to a single point, that is, to show the obligatory and conclusive effect of those agreements upon both of the states, as an accord and compromise of a disputed right, deliberately made, and with full knowledge on both sides; proceeds to aver, " that the defendant has occupied and exercised jurisdiction, and enjoyed all rights and sovereignty, according

to the same, from the date hereof to the present time." And he then sums up his defence in the following words:

" And the said defendant doth plead the said agreement of the 19th January, 1710, and the said agreement in pursuance and confirmation thereof of the 22d October, 1718, and unmolested possession, according to the same, from the date of the said agreements, in bar to the whole bill of complaint of the said complainant; and against any further or other reliefs therein."

The defence set up by this plea is twofold: 1. That there was an accord and compromise of a disputed right. 2. Prescription, or an unmolested possession from the time of the agreement, that is, of more than one hundred years. These two defences are entirely distinct, and depend upon different principles. If what the defendant alleges be true, then the agreements themselves conclude the controversy. For if, as the plea avers, there was a dispute between these two colonies, in respect to the boundary between them, and that dispute was settled by persons duly authorized to bind the respective parties; and if, as stated in the plea, the agreement of October 1718, to run the line from the stake set up by Woodward and Saffrey, was accepted, ratified, and confirmed by Rhode Island; and if the running of the line afterwards in 1719, pursuant to such agreement, was also approved by Rhode Island; then there can no longer be any controversy between them. They must, on both sides, be bound by the accord and compromise of those whom they had authorized to bind them, and whose conduct they afterwards approved; provided the settlement was made, as the plea alleges, with a full and equal knowledge of all the circumstances. The various facts stated by the defendant, in relation to these agreements, contribute to support them, and conduce to establish this point of his defence. And, assuming that the plea and answer are true in all these statements, then an accord and compromise is established, which was obligatory upon the parties from the moment it was finally ratified. And taking every thing averred by the defendant on this point of the defence to be correct, Rhode Island would have been as effectually barred as she is at the present moment, if she had commenced this controversy within a month after the accord was made. The lapse of time is not at all necessary to give validity to such a settlement; or to support the defence founded upon it. It is a matter entirely distinct from it; and if it has any operation in the cause, it is another defence, and one of a different character. It is not an accord and compromise of a doubtful right—it is prescription.

Rhode Island, indeed, avers, that the possession was constantly disputed on her part, and efforts made from time to time to regain it; and that it has always been an open question, since the error in the line was first discovered, down to the present time. But, as we have already remarked, when the plea is set down for argument, the statements contained in it are admitted to be true. And according to the allegations there made, this long possession was unmolested. In that state of the fact, separated from all the averments

of Rhode Island, the possession of more than one hundred years would become a rightful one by prescription; even if it had begun in wrong and injustice. The acquiescence of the adjoining state for such a lapse of time, would be conclusive evidence that she assented to the possession thus held, and had determined to relinquish her claims. The possession, therefore, if a defence at all, is a separate and complete one of itself; and forms no part of the accord and agreement alleged in the plea. Here, then, are two defences in the same plea; contrary to the established rules of pleading.

A few cases will illustrate these principles, and show what constitutes duplicity in pleading. In the case of Whitebread vs. Brockhurst, 1 Br. Ch. Rep. 404, where to a bill for a specific performance of an agreement, the defendant put in a plea which averred two facts: first, that there was no agreement in writing; and, secondly, that there had been no acts done in part performance: Lord Thurlow overruled the plea as double, it containing two different points, and therefore, proper for an answer. And in delivering his opinion on that occasion, he says, "the use of a plea here is to save time, expense, and vexation; therefore, if one point will put an end to the whole cause, it is important to the administration of justice that it should be pleaded; but if you are to state many matters, the answer is the most commodious form to do it in." We are aware that this decision has been questioned. But it is quoted with approbation, and recognised as authority in 7 Johns. Ch. Cases, 216; where Chancellor Kent, speaking of the case of Whitebread vs. Brockhurst, says, "the reasoning of Lord Thurlow is supposed to be weighty and decisive; and since that time it has been the constant language of the Court, that the plea must reduce the defence to a single point, and that a defendant can never plead double."

Again, in the case of Claridge vs. Hoare, 14 Ves. 65, 66, Lord Eldon, in speaking of the case of Beachcroft vs. Beachcroft, where it had been held that the plea of a release, with an averment that it had been acted upon, was multifarious, expressed his doubts of that decision, upon the ground that the release was effectual without being acted upon, and the latter averment might have been rejected as surplusage. The reasoning of Lord Eldon shows that if the second averment would have been a good point of defence, the plea would have been bad. The acting upon the release, in Beachcroft vs. Beachcroft, was altogether unimportant, and could not, if true, affect the rights of the parties. But not so, as to the possession here pleaded. If true, as pleaded, it is of itself a defence, and could not therefore be rejected as surplusage. The case of The Corporation of London vs. The Corporation of Liverpool, 3 Anst. Rep. 738, also illustrates and supports the principle we have stated. It is unnecessary, however, to multiply cases on this subject. They are all collected together in Story's Equity Pleading, where the subject is very fully examined. We hold it to be perfectly clear, that in the case of an individual, the plea of a release and of the statute of

limitations; or of an award and the statute of limitations; could not be united in the same plea. And if so, it would seem irresistibly to follow, that the accord and compromise, and the title by prescription, united in this plea, render it multifarious; and that it ought to be overruled on that account.

We have carefully avoided expressing any opinion upon the merits of this controversy; and have confined ourselves to the case as presented to the Court by the pleadings. The facts stated in the bill, and not noticed in the plea, are not yet admitted or denied; and consequently we do not know in what form the case may ultimately come here for decision.

In the case of Rowe *vs.* Tweed, 15 Ves. 377, 378, Lord Eldon remarks, that "the office of a plea generally is not to deny the equity, but to bring forward a fact, which, if true, displaces it." A plea, therefore, in general, presupposes that the bill contains equitable matter, which the defendant by his plea seeks to displace. It is according to this principle of equity pleading that we have treated the case before us. If a defendant supposes that there is no equity in the bill, his appropriate answer to it is a demurrer; which brings forward at once the whole case for argument. The case of Milligan *vs.* Mitchell, 3 Cranch, 220. 228, illustrates this rule, and shows that the defence here taken was more proper for an answer or demurrer than a plea.

The course determined on recommends itself strongly to the Court, because it appears to be the only mode in which full justice can be done to both parties. Each will now be able to come to the final hearing, upon the real merits of their respective claims, unembarrassed by any technical rules. Such, unquestionably, is the attitude in which the parties ought to be placed in relation to each other. If the defendant supposes that the bill does not disclose a case which entitles Rhode Island to the relief she seeks; the whole subject can be brought to a hearing by a demurrer to the bill. If it is supposed that any facts are misconceived by the complainants, and therefore erroneously stated; the defendants can put these in issue by answering the bill. The whole case is open; and upon the rule to answer which the Court will lay upon the defendant, Massachusetts is entirely at liberty to demur or answer, as she may deem best for her own interests.

Mr. Justice M'LEAN.

The Massachusetts charter was granted by King Charles the First, and is dated the 4th March, 1628. It conveyed to Sir Henry Rosewell and others, "all that part of New England, in America, which lies and extends between a great river, there commonly called Monomack, alias Merimac, and a certain other river called Charles river, &c.; and also all and singular those lands and hereditaments whatsoever, lying within the space of three English miles on the south part of the said Charles river, or of any or every part thereof," &c.

On the 8th July, 1663, King Charles the Second granted the charter of Rhode Island, "bounded on the west, or westerly, to the middle or channel of a river there, commonly called and known by the name of Pawcatuck river, and so along the said river, as the greater or middle stream thereof reaches or lies up into the north country: northward unto the head thereof, and from thence by a straight line drawn due north until it meets with the south line of the Massachusetts; and on the north or northerly, by the aforesaid south or southerly line of the Massachusetts colony or plantations," &c.

The line which limits Massachusetts on the south, and Rhode Island on the north, is the subject matter of controversy in this case. The bill states, that for many years after the Rhode Island charter was granted, the northern part of the colony, adjoining Massachusetts, remained wild and uncultivated; and the land was of little value: that a short time previous to the year one thousand seven hundred and nine, a dispute arose respecting the northern boundary; and that Massachusetts appointed one Joseph Dudley on her part, and the General Assembly of Rhode Island appointed and empowered one Joseph Jenckes on her part, to ascertain and settle the disputed line: that these persons met, together with one Nathaniel Paine, one Nathaniel Blagrove, and one Samuel Thaxter, of Massachusetts; and one Jonathan Sprague, and one Samuel Wilkinson, of Rhode Island; at Roxbury, in Massachusetts, the 19th January, 1710: and that the said Joseph Dudley, Nathaniel Paine, Nathaniel Blagrove, and Samuel Thaxter, represented to the said Jenckes, Sprague, and Wilkinson, that one Nathaniel Woodward, and one Solomon Saffrey; who, they also represented to be skilful and approved artists; had, before that time, that is to say, in 1642, ascertained the point or place, three English miles south of the river called Charles river, or of any or every part thereof, and had there set up a stake: and that Jenckes, Sprague, and Wilkinson, relying on their representations, and believing the point or place to have been ascertained, and that it was three English miles, and no more, south of Charles river, or of any or every part thereof; the said Dudley and Jenckes, in the presence of, and with the advice of, the other persons named; signed and sealed a certain writing, called an agreement, that the boundary should be run from the stake set up by Woodward and Saffrey.

And the complainant states, that no stake or monument at that time existed, by which could be ascertained the place where it was set up by Woodward and Saffrey: that the agreement was entered into without going to the place of beginning, and without ascertaining whether it was not more than three miles south of Charles river; and whether the line was run as stated in the agreement.

That neither the colony, nor the state of Rhode Island, has ever assented to or confirmed the agreement; nor has the town of Providence, nor the colony, enjoyed the tract of land specified in the agreement, of one mile in breadth, north of Woodward and Saffrey's line: that this line was not shown nor run in six months after the

agreement; nor were any marks, stakes, or other memorials made, to identify the place of beginning.

That this controversy respecting the line continued; and that Massachusetts, on the 18th June, 1717, enacted an order, in the words following: "The season of the year having been such, this spring, that the committee appointed in November last, to run the line between this government and the government of Rhode Island, could not attend the service, ordered: that the honourable Nathaniel Paine, Esquire, Samuel Thaxter, Esquire, and John Chandler, Esquire, be a committee to join with such as the said government of Rhode Island shall empower, to proceed in and perfect the running and settling the line between this province and the said colony, pursuant to the agreement lately made for that end by commissioners of both governments," &c. And on the 16th November, 1717, the General Court of Massachusetts resolved, that Nathaniel Blagrove, Esquire, be added to the committee. And afterwards the General Court resolved, that "whereas this house is informed that the government of Rhode Island have fully empowered the committee, which they have appointed, to run the line between this province and that government; to agree, compromise, and issue the governments on that affair, and finally settle the dividing boundary: Resolved, that if the said committee shall attend that service, so empowered, that the committee appointed by this Court to join in running the said line, be also vested with like powers; and are hereby fully empowered to agree, compromise, and issue the difference between the governments in the said affair; and to make a full and final settlement of the line between that government and this."

That on the 17th June, 1718, the Assembly of Rhode Island passed the following act: "Whereas the committee appointed and empowered by the General Assembly of this colony, at their sessions, on the first Wednesday of May, 1717, to perfect and settle the line between the said colony and the province of Massachusetts bay, were bound up or restricted to an agreement made at Roxbury between Colonel Dudley and Major Jenckes, &c., so as the matter in difference between the two colonies, as to the stating and settling the said line hath been retarded, to the considerable charge of the colony, this Assembly, taking the premises under consideration, do hereby, enact, constitute, and appoint, Major Joseph Jenckes, Major Randal Holding, Major Thomas Fry, Captain Samuel Wilkinson, and Mr. John Mumford, surveyor, a committee, to treat and agree with such gentlemen as are or may be appointed and commissioned by Massachusetts to settle the line," &c.

That on the 2d October, 1718, the commissioners on both sides met at Rehoboth, and, after discussing the subject, entered into an agreement under their hands and seals. "that the stake set up by Woodward and Saffrey, in 1642, upon Wrentham plain, be the station or commencement of the line," &c.

The complainant alleges that this agreement was also entered into without examination of the place where the stake was originally set

up ; and without ascertaining whether the place was not more than three English miles south of Charles river, or of any or every part thereof. That the Rhode Island commissioners believed the statements made to them on this subject, by the commissioners of Massachusetts.

The Rhode Island commissioners made a return of their proceedings to their legislature ; who accepted it, and ordered it to be recorded.

On the 12th May, 1719, the commissioners on both sides run the line, beginning at the place where it was supposed the stake had been erected by Woodward and Saffrey ; but which stake was not found, and was more than seven miles from Charles river, or any or every part thereof. The commissioners made a return of their survey, which was received and approved of by the legislature of Rhode Island. But the complainant alleges that the persons making the survey were not authorized to act in the premises by Rhode Island. And the bill states the line was never confirmed by Rhode Island ; that the colony maintained that the true line was to begin three miles south of Charles river : and the complainant avers that all the above proceedings and agreements were founded upon the belief that the point or place three English miles south of Charles river, or of any or every part thereof, had been correctly and truly ascertained by Woodward and Saffrey.

In the year 1750, the General Assembly of Rhode Island passed an act authorizing the boundary line to be run, and appointing certain persons to perform this duty. In the preamble to this act, it is stated that the line never has been settled and run according to the royal charter ; and that divers persons have set forth their right to the Assembly to be under the jurisdiction of Rhode Island, instead of that of Massachusetts. The commissioners appointed by this act, were authorized to meet any commissioners appointed by Massachusetts, and to settle the boundary, and run the line. But if Massachusetts should decline to act, then the Rhode Island commissioners were required to run the line agreeably to the charter, and make return of their proceedings.

It is stated in the bill, that commissioners were appointed by Massachusetts, but they declined to meet the commissioners of Rhode Island : who, after waiting two days near the place of beginning, proceeded, ex parte, to run the line, and make return thereof.

This report was accepted by the Assembly; and the commissioners were continued in office.

The bill then states, that the Massachusetts commissioners, appointed as above, made a report of their proceedings to the council, the 13th April, 1750.

The bill further states, that remonstrances were made to Massachusetts, against its exercise of jurisdiction over the country within the chartered limits of Rhode Island, so long as the royal government continued ; that unsuccessful attempts were made to bring the subject before the king in council; but the population of Rhode

Island being small, and her means limited, and war between England and France having soon after taken place, interposed insurmountable obstacles.

In the year 1782, on the petition of a large number of the inhabitants residing within the controverted limits, the Assembly of Rhode Island made a report in favour of its claim.

In the year 1791, the bill states, the legislature of Massachusetts passed an act, duly appointing Walter Spooner, Elisha Mayard, and David Cobb, commissioners, for ascertaining the boundary line between the said state of Massachusetts and the state of Rhode Island; and that in the same year, the Rhode Island Assembly passed an act, appointing William Bradford, Jabez Bowen, and Moses Brown, commissioners, for ascertaining the boundary. These commissioners met at Wrentham, in Massachusetts, in 1791, but they could not agree on the line. They, however, agreed, in writing, to measure from Charles river three miles south, as claimed by each state, as the place of beginning; and to recommend to their respective governments to have the dispute adjusted, by a reference of it to disinterested persons, or by application to Congress.

These commissioners reported their proceedings to their respective states. And the bill further states, that in the year 1809 the parties again appointed commissioners, who continued in office until 1818; but they were not able to settle the line.

The state of Massachusetts pleads in bar to the bill, that in 1642, for the purpose of ascertaining and establishing the true southern boundary line of the colony of Massachusetts, a station or monument was erected and fixed at a point then taken and believed to be on the true and real boundary line of said colony; and a line continued therefrom westerly to Connecticut river; which said monument or station then became and ever since has been well known and notorious; and then was and ever since has been called Woodward and Saffrey's Station, on Wrentham plains; and after fixing of said station and running the line aforesaid, and after the granting of the charter of Rhode Island, and while all the territory north of said station and line was claimed, held, and possessed, and jurisdiction over the same exercised and enjoyed by Massachusetts, as parcel of her own territory, viz., in the year 1709, disputes having arisen between the two governments respecting the said boundary line, under an act of the Assembly, the governor of Rhode Island colony appointed Major Joseph Jenckes to meet with his excellency, Colonel Joseph Dudley, governor of Massachusetts, to settle the boundary; and it was declared that what they should agree upon should be forever after deemed the true boundary.

These persons met at Roxbury, in January 1710, 1711, and after a full discussion of the subject, agreed that "the stake set up by Nathaniel Woodward and Solomon Saffrey, skilful and approved artists, in the year 1642, and since that often renewed, in the latitude of forty-one degrees and fifty-five minutes, being three English miles distant southward, from the southernmost part of the river called

Charles river, agreeably to the letters patent for the Massachusetts province, be allowed on both sides the commencement of the line between the Massachusetts and the colony of Rhode Island, and to be continued between the two governments, &c., as is deciphered in the plan and tract of that line by Nathaniel Woodward and Solomon Saffrey, now shown forth to us, and is remaining on record in the Massachusetts government."

"And whereas, upon presumption, by mistake or ignorance of that line, the inhabitants of the town of Providence, in the colony of Rhode Island, have surveyed and laid out several lots and divisions of land to the northward of Woodward and Saffrey's line aforesaid, on the Massachusetts side; it is agreed that there shall be and remain unto the said town of Providence, and inhabitants of the government of Rhode Island, a certain tract of land of one mile in breadth to the northward of said line, as described and platted; beginning from the great river of Pautucket, and so to proceed at the north side of the said patent line of equal breadth, until it come to the place where Providence west line cuts the said patent line, supposed to contain five thousand acres, be the same more or less; the soil whereof shall be and remain to the town of Providence, or others, according to the disposition thereof 'to be made by the government of Rhode Island aforesaid. Nevertheless, to continue and remain within the jurisdiction of Massachusetts."

"And it was agreed that persons to be appointed respectively by the two governments, should attend the first good season, within six months, to show the ancient line of Woodward and Saffrey, and to raise and renew the marks and memorials of the same."

This agreement was signed and sealed by Dudley and Jenckes, in the presence and by the advice of Nathaniel Paine, Nathaniel Blagrove, and Samuel Thaxter, on the part of Massachusetts; and by Jonathan Sprague, and Samuel Wilkinson, on the part of Rhode Island.

"And the said defendant avers, that the whole real and true merits of said complainant's supposed cause or causes of action, were fully heard, tried, and determined by the said Jenckes and Dudley; that the said agreement was fair, legal, and binding between the parties; and was in all respects and all particulars, a valid and effectual settlement of the matter in controversy, and was had and made without covin, fraud, or misrepresentation; and with a full and equal knowledge of all circumstances, by both parties."

And the plea further avers, that the 18th June, 1718, in order to perfect and complete the running and settling of the line in pursuance of the above agreement, Nathaniel Paine, Samuel Thaxter, and John Chandler, were appointed a committee by Massachusetts, to which was afterwards added the name of Nathaniel Blagrove, to unite with a committee that should be appointed by Rhode Island for that purpose. And they were fully empowered to agree and compromise the dispute. And Rhode Island adopted in its As-

sembly the following act: "Whereas, the committee appointed and empowered by the General Assembly of this colony, in May 1718, to perfect and settle the line between the said colony and that of Massachusetts, were bound up or restricted to an agreement made at Roxbury between Colonel Dudley and Major Jenckes, &c., so as the matter in difference between the two colonies, as to the stating and settling the said line, hath been retarded, &c. And the Assembly hereby enact, constitute, and appoint Major Joseph Jenckes, Major Randal Holding, Major Thomas Fry, Captain Samuel Wilkinson, and Mr. John Mumford, surveyor, a committee to treat and agree with the committee of Massachusetts; and full power was given to settle and compromise the controversy respecting the line. The said committees having met at Rehoboth, in Massachusetts, entered into an agreement under seal, that the stake set up by Woodward and Saffrey in 1642, upon Wrentham plains, be the station from which to begin the line which shall divide the two governments," &c.

This agreement, on the 29th October, 1718, was accepted by the General Assembly of Rhode Island, and recorded; and was thereby certified and confirmed by the same. And the plea avers that said Paine, Blagrove, and Thaxter, or either of them, made no false representation whatsoever to the commissioners of Rhode Island; but that the agreement was done and concluded fairly and in good faith, with a full and equal knowledge of all the circumstances, by the respective parties.

The plea states that the Massachusetts commissioners made a report of their proceedings, in regard to the place of beginning and the running of the line, which was approved by the legislature. And that from the date of said agreements to the present time, Massachusetts has possessed and enjoyed all the territory, and exercised jurisdiction over the same, north of the said line; and that the place where the stake was set up by Woodward and Saffrey is well known, and has ever been notorious since the stake was set up. And the aforesaid agreements, and the unmolested possession according to the same, are pleaded in bar.

And the defendant, not waiving said plea, pleaded as aforesaid, but relying and insisting on the same, by way of answer, in support of said plea, and to every thing alleged in said bill to show that the said agreements ought not to stand, and be allowed as good and conclusive against the parties, and a valid and effectual bar, &c., saith that the said agreements, &c., were fair and legal, obtained without fraud or misrepresentation, and with a full and equal knowledge of all circumstances in both parties; and that it was a valid and effectual settlement of the matter in controversy; and that it never has been in any way rescinded, abandoned, or relinquished.

This case having assumed the forms of a Chancery proceeding, the established rules of Chancery pleading must govern it. In this mode the points for decision are raised; but the Court, in deciding the questions involved, may apply principles of the common law,

[The State of Rhode Island *vs.* The State of Massachusetts.]

of Chancery, or of national law; as they shall deem the circumstances of the case require.

The plea sets up certain agreements in bar of the relief prayed for, which substantially appear upon the face of the bill; and it is insisted that, in such case, a demurrer, and not a plea in bar, is the proper mode of defence; that the great object of the bill is to set aside these agreements; and that, under such circumstances, they cannot be pleaded in bar.

On general principles, it would seem to be unreasonable that the complainant, by stating the matter in bar in his bill, should prevent the respondent from pleading it. And such is not the established rule in Chancery pleading.

A plea is a special answer to the bill, and generally sets up matter in bar, which does not appear in the bill; but this is not always the case.

An award may be pleaded to a bill, to set aside the award and open the account. Mit. 260. 2 Atk. 501. 3 Atk. 529. 644.

If the plaintiff, or a person under whom he claims, has released the subject of his demand, the defendants may plead the release in bar of the bill; and this will apply to a bill praying that the release may be set aside. Mit. 261. 1 Atk. 294. 6 Madd. 166. 2 Sch. and Lefr. 721. 3 P. Wms. 315.

If a bill be brought to impeach a decree, on the ground of fraud used in obtaining it, the decree may be pleaded in bar of the suit. 3 Bro. P. C. 558. 2 Eq. Ca. Ab. 177. 7 Viner. Ab. 398. 3 P. Wms. 95.

These authorities show, that a plea in bar may embrace matters stated in the bill. Where the matters in defence are fully stated in the bill, and it contains no allegations which it is necessary to deny by a plea, and by an answer, in support of the plea, a demurrer should be filed.

A question in this case is made, whether the plea is not multifarious, and, consequently, bad?

The rules which govern a special plea at law, are substantially the same as apply to a plea in Chancery. It must be single, and not double. Its office is, to bring forward a fact, which may be the result of a combination of circumstances; and which, if true, bars the relief prayed for in the bill. 15 Ves. 377. A plea, in order to be good, must be either an allegation or a denial of some leading fact, or of matters which, taken collectively, make out some general fact, which is a complete defence. Story's Eq. Pl. 497. 4 Sim. Rep. 161. 7 Johns. Ch. 214. Beames' Pl. in Eq. 10. But, although a defence offered by way of plea should consist of a great variety of circumstances, yet, if they all tend to a single point, the plea may be good. Thus, a plea of title derived from the person under whom the plaintiff claims, may be a good plea, though consisting of a great variety of circumstances; for the title is a single point, to which the cause is reduced by the plea. So a plea of conveyance, fine, and non claim, would be good, as amounting to one title. Cooper's Eq. Pl. 225.

z 2

Beames' Pl. in Eq. 18.   Mit. Eq. Pl. 296.   The result of all the authorities is, that various facts may be pleaded if they conduce to a single point, on which the defendant means to rest his defence. And by this rule the plea in this case must be tested.

The defendant pleads in bar to the right asserted in the bill, the establishment of the Woodward and Saffrey station, as the place where the contested boundary line is to commence, and from which it was in fact run. And to support this, the agreements of 1710 and 1718 are relied on, and also the unmolested possession according to the same.

These agreements, and the unmolested possession according to them, are facts and circumstances which conduce to prove the right or title asserted in the plea.   They are consistent with each other; and can in no correct sense be considered as tending to establish distinctive grounds of title.

The two agreements are substantially the same; and the unmolested possession, according to the agreements, is a consequence which naturally follows, and tends very strongly to confirm them.

The important fact asserted in the plea is, that the controversy was amicably adjusted between the parties by the establishment of the line; and there is not a fact or circumstance averred in the plea, which does not go to support this main fact.   This plea then cannot be multifarious.   The point relied on is single and distinct, although it is established by a variety of facts and circumstances.

Mere surplusage will not render a plea multifarious, or double. Beames' Pl. in Eq. 19, 20.   In Story's Eq. Pl. n. 3, it is remarked, what constitutes duplicity or multifariousness in a plea, is sometimes a matter of great nicety upon the footing of authority.   A plea cannot contain two distinct matters of defence; for, if more than one defence be admitted, it is well observed, there may be as many grounds of defence stated in a plea as in an answer; and this would defeat the object of the plea.

Where in a bill praying a conveyance for four estates, the defendant put in a plea of a fine as to one estate, and in the same plea, he put in a disclaimer as to the other estates, the plea was overruled; for the disclaimer was wholly disconnected with the plea of the fine, and the plea was therefore double.   Facts inconsistent with each other cannot be pleaded, for this would set up two defences.   But where the facts, however numerous, all conduce to establish one point, as in the plea under consideration, it is not multifarious. Story's Eq. Pl. 499.

This plea goes to the whole bill, and the matter in bar is clearly and distinctly averred. These averments must be sufficient to support the plea, and exclude intendments against the pleader.   2 Ves. 245. 2 Sch. and Lef. 727.   18 Ves. 182.

The defendant has filed an answer in support of his plea, and this is necessary where there are equitable circumstances stated in the bill, in favour of the plaintiff's case, against the matter pleaded. These allegations in the bill must be denied by way of answer, as

well as by averments in the plea. 6 Ves. 594. 2 Ves. and B. 364. In such case, the answer must be full and clear, or it will not be effectual to support the plea; for the Court will intend the matters so charged against the pleader, unless they are fully and clearly denied. But if they are, in substance, fully and clearly denied, it may be sufficient to support the plea; although all the circumstances charged in the bill may not be precisely answered. Mit. 298, 299. 2 Atk. 241. 1 Sim. and Stu. 568. 5 Bro. Pl. Ch. 561.

The answer goes to the whole bill, and it denies all fraud, misrepresentation, or unfairness; and every allegation in the bill which goes to show that the agreements set forth in the plea should not be binding and conclusive on the parties.

A question is made, whether this answer, which goes to the whole bill, and denies the same facts as are denied in the plea, does not overrule the plea.

This objection seems to derive some support from certain decisions made in the Exchequer, and which have been, somewhat loosely, copied into some of the elementary treatises on Chancery pleading. But these decisions have never been sanctioned by the High Court of Chancery in England; whose rules of practice have been adopted by this Court.

The rule is, that the answer must not be broader than the plea; but must, in support of the plea, deny fraud and all equitable circumstances alleged in the bill, which are also by a general averment denied by the plea.

The answer, when filed in support of the plea, forms no part of the defence. It is evidence which the plaintiff has a right to require, and to use to invalidate the defence made by the plea. 6 Ves. 597. In a note in Mit. 240, it is said, "that in the cases in the Court of Exchequer, it seems to have been supposed that the answer in support of the plea overruled the plea. But an answer can only overrule a plea where it applies to matter which the defendant, by his plea, declines to answer; demanding the judgment of the Court whether, by reason of the matter stated in the plea, he ought to be compelled to answer so much of the bill."

If the plea goes only to a part of the bill, and prays the judgment of the Court whether he shall be compelled to answer the other part; and the answer goes to the whole bill, the answer being broader than the plea, overrules it. For the answer is to the part of the bill which it is the object of the plea not to answer.

As this plea extends to the whole bill, it is essential to its validity that such facts should be averred in it as shall make a complete defence. But it is not necessary in the plea to notice every allegation in the bill which does not involve the facts that constitute the bar.

Where the plea does not cover the whole bill, as where it only sets upon a matter in bar to a part of the relief sought in the bill, the other part of the bill must be answered. In the case under con-

sideration, the answer in support of the plea is not broader than the plea, and consequently does not overrule it.

I come now to examine the great question in the case; and that is, whether the matter in bar, set out in the plea, constitutes a good defence to the bill.

In entering upon this subject, it may not be improper to notice the hardship complained of by the plaintiff's counsel, in setting up the defence by a special plea.

It is said that the ground assumed is narrow and technical, and excludes the full merits of the controversy from being examined. That no opportunity is afforded the plaintiff to prove the mistake by the commissioners, in agreeing to Woodward and Saffrey's station as the place where the boundary line was to begin; and which is the main ground on which the bill prays for relief.

It is true, a plea somewhat narrows the ground of controversy. Whilst it must contain all the facts material to a complete defence, it need not be extended to all the allegations of the bill. And the plaintiff may either take issue on the plea, or admit the truth of it, by setting it down for hearing; as has been done in this case.

The office of a plea is to reduce the cause to a single point, and thus prevent the expense and trouble of an examination at large. But the matters stated in the bill, which are not denied by the plea, are admitted to be true. The case of the plaintiff then, as now to be considered, is as full and as strong as it is presented in the bill, where not denied by the plea. The averments of the plea are admitted to be true; and the question is, whether those averments, counteracted by any allegations in the bill, not denied by the plea, constitute a bar to the right asserted by the plaintiff.

The plea states that in the year 1642, Woodward and Saffrey erected a station or monument at a point then taken, and believed to be on the true and real boundary of Massachusetts, on the south. And that in 1710, this station was agreed to be the true boundary, and the place from which the line should be run, by Dudley and Jenckes, commissioners appointed by Massachusetts and Rhode Island; and who were authorized to settle and establish the line. And that afterwards, in the year 1718, other commissioners were appointed by Massachusetts and Rhode Island, to whom ample powers were given to compromise and settle forever the boundary; and who established the same place of beginning. And that the report made to Rhode Island by its commissioners, setting forth the agreement, was accepted by its legislature, and duly recorded and ratified.

And the plea avers, that the Massachusetts commissioners were guilty of no fraud or misrepresentation; and that both agreements were entered into with perfect fairness, and in good faith; and with full and equal knowledge by the parties. That the claims of the plaintiff, as set forth in the bill, were fully heard, discussed, and settled. And that Massachusetts has retained possession and exercised

[The State of Rhode Island *vs.* The State of Massachusetts.]

jurisdiction over the country north of the line thus established, until the present time.

These are the facts, substantially, on which the defendant relies, as a bar to the plaintiff's bill.

The principal ground of relief alleged in the bill is, the mistake in fixing the place from which the line was to run more than seven miles south of Charles river; whereas by the charter of Massachusetts, it was to be but three miles south of that river.

By the charter, the boundary was declared to be "three English miles south of any or every part of Charles river."

Some doubt may arise from this phraseology, whether the three English miles are to be measured from the source of the southern branches of Charles river, or from the main channel of the river. And it would seem, from the establishment of the Woodward and Saffrey station, and other acts done in reference to this boundary shortly after the date of the charter, and when its language was at least as well understood as at present, that the measurement was understood not to be required from the body of the river. At that early day the country was a wilderness, and the land was of but little value; so that Massachusetts could have felt no very strong interest in establishing the line farther south than was authorized by the charter.

The bill alleges a mistake in this distance from the river, of the Woodward and Saffrey station by the commissioners of Rhode Island, in both of the agreements respecting the boundary; and this mistake is not denied by the plea. But, in the language of the plea, these agreements are now to be considered as having been fairly mat_, in good faith, without fraud or misrepresentation by the Massachusetts commissioners; and with an equal and full knowledge of the facts and circumstances of the case. And the inquiry is, whether a mistake committed under such circumstances affords a sufficient ground on which to set aside the agreements.

I will first consider the principles of this case, as they would apply to a controversy between individuals respecting a common boundary.

The mistake of a fact, unless it operates as a surprise or fraud on the ignorant party, affords no ground for relief in Chancery. 1 Story's Eq. 160. 2 Ball and Beatt. 179, 180. 4 Bro. Ch. Rep. 158. 6 Ves. 24.

The ground of relief in such cases is, not the mistake or ignorance of material facts alone, but the unconscientious advantage taken of the party by the concealment of them. For if the parties act fairly, and it is not a case where one is bound to communicate the facts to the other, upon the ground of confidence or otherwise; the Court will not interfere. 1 Story's Eq. 160. 9 Ves. 275.

It is essential, in order to set aside such a transaction, not only that an advantage should be taken, but it must arise from some obligation in the party to make the discovery; not an obligation in

point of morals only, but of legal duty.   2 Bro. Ch. 420.   1 Har. Eq. b. 1, ch. 3, 4, note n.

Equity will not relieve where the means of information are open to both parties; and where each is presumed to exercise his own judgment.   2 Wheat. 178. 195.   Where an agreement for the composition of a cause is fairly made between parties with their eyes open, and rightly informed, a Court of Equity will not overhaul it; though there has been a great mistake in the exercise of judgment. 1 Ves. 408.   1 Story's Eq. 163.

In like manner, where the fact is equally unknown to both parties; or where each has equal and adequate means of information; or where the fact is doubtful from its own nature ; in every such case, if the parties have acted with entire good faith, a Court of Equity will not interpose.   For in such cases, the equity is deemed equal between the parties; and when it is so, a Court of Equity will not interfere.   1 Pow. on Con. 200,   1 Madd. Ch. Pr. 62—64. 1 Story's Eq. 163.

The principles recognised by these authorities, apply in all their force and conclusiveness to the case under consideration.   A greater number of authorities might be cited, but it cannot be necessary.   The principles stated are founded on reason and the fitness of things; and they have been sanctioned by a uniform course of adjudication.

If these rules are to be respected, and the mistake alleged in the bill had occurred under precisely the same circumstances between individuals, it would seem to be clear, that there would be no ground for relief.

A controversy exists between individuals respecting a common boundary.   One party claims that the line should begin at a certain point, and the other at a different one.   Arbitrators are appointed, with full powers to settle and compromise the dispute, who establish the point as claimed by one of the parties.   Some dissatisfaction is subsequently manifested by the unsuccessful party; and seven years after the first reference, a second one is made to other persons, who are vested with ample powers to settle and compromise the controversy; and they do settle it in exact conformity to the first award; and this second award is reported to the principals, who sanction it.   In addition to this, the line or place of beginning established by the arbitrators, is the place claimed by the successful party, as his line, more than seventy-five years before the second award; and more than twenty years before the other party had any interest in the boundary.   And the conduct of the arbitrators is free from any imputation of fraud or unfairness; all having equal and full knowledge of the matter in dispute, which was fully and fairly discussed and understood, and finally determined.

A case under these circumstances between individuals, to say nothing of the lapse of time and acquiescence, since the award,

would not seem to be very strongly recommended to the equitable interposition of the Court, on the ground that the arbitrators mistook a fact: a mistake not induced by the opposite party, or by misrepresentation, but into which the arbitrators of the unsuccessful party had innocently fallen, having as full a knowledge of the whole merits of the case as the arbitrators chosen by the other party.

Relief, which should set aside the award, and open up the controversy, under such circumstances, would create a new head of equity.

The mistake is admitted, because it is not denied by the plea; and this may be said to be a technical advantage of the plaintiff. For if the fact of mistake were to be tested by the circumstances of the case, it would be difficult to come to the conclusion that a mistake had really occurred. If it were admitted to have taken place, in the first award, it would require no small degree of credulity to believe, that it again occurred in the second award, made seven years after the first one; and after much dissatisfaction had been manifested against the first award. This dissatisfaction could only have arisen, from the supposed fact that the boundary had been established too far south.

But as the case is now considered, the mistake alleged is admitted; but admitted under all the averments of the plea.

If the Woodward and Saffrey station be as many miles south of Charles river, as alleged in the bill; it would seem to be a more reasonable supposition that it was agreed to, under a construction of the charter, or on the principles of compromise; than through mistake. But the mistake being admitted, still, as between individuals, there would be no sufficient ground for the interposition of a Court of Equity.

And if relief could not be given between individuals, can it be decreed under the same circumstances as between sovereign states. There are equitable considerations, which would seem to apply with greater force to controversies between individuals, than to those which arise between states. Among states, there is a higher agency, greater deliberation, and a more imposing form of procedure, in the adjustment of differences, than takes place between private individuals. Between the former, from the nature of the proceeding, mistakes of fact seldom occur; and when they do happen, it is rather a question of policy than of right, whether they shall be corrected.

I am inclined to think with the counsel on both sides, that the great question in this case should not be decided by the rules for the settlement of private rights.

The high litigant parties, and the nature of the controversy, give an elevation and dignity to the cause which can never belong to differences between individuals. It may be a simple matter to determine where a line shall be run; but when such determination may draw after it a change of sovereign power over a district of

country, and many thousand citizens, the principles involved must be considered as of the highest magnitude. The question is national in its character; and it is fit and proper that it should be decided by those broad and liberal principles which constitute the code of national law.

Vattel, in his treatise, 277, says, " When sovereigns cannot agree about their pretensions, and are nevertheless desirous of preserving or restoring peace, they sometimes submit the decision of their disputes to arbitrators, chosen by common agreement. When once the contending parties have entered into articles of arbitration, they are bound to abide by the sentence of the arbitrators: they have engaged to do this; and the faith of treaties should be religiously observed."

And again : " In order to obviate all difficulty, and cut off every pretext of which fraud might make a handle, it is necessary that the arbitration articles should precisely specify the subject in dispute, the respective and opposite pretensions of the parties, the demands of the one and the objections of the other. These constitute the whole of what is submitted to the decision of the arbitrators; and it is upon these points alone that the parties promise to abide by their judgment. If, then, their sentence be confined within these precise bounds, the disputants must acquiesce in it. They cannot say that it is manifestly unjust; since it is pronounced on a question which they have themselves rendered doubtful by the discordance of their claims, and which has been referred, as such, to the decision of the arbitrators. Before they can pretend to evade such a sentence, they should prove, by incontestable facts, that it was the offspring of corruption or flagrant partiality."

And again, in page 178, he says, " Arbitration is a very reasonable mode, and one that is perfectly conformable to the law of nations, for the decision of every dispute which does not directly interest the safety of the nation. Though the claim of justice may be mistaken by the arbitrators, it is still more to be feared that it will be overpowered in an appeal to the sword." The author well observes, that the Helvetic republic, by a wise adherence to this mode of adjusting controversies among themselves, and with foreign countries, has secured its liberty, and made itself respectable throughout Europe.

These principles have been established by the common consent of the civilized world. And where they are invoked in the settlement of disputes between states, and the proceeding is characterized by fairness and good faith, it ought not to be set aside, and indeed cannot be; without, in the language of Vattel, proving by the clearest evidence that the award was the offspring of corruption or flagrant partiality. And if the determination of the arbitrators has the sanction of time as well as of principle, it is believed that history affords no instance where it has not been considered as absolutely binding on the parties. The peace of nations, and the prosperity of mankind, require that compacts thus formed should be held sacred.

[The State of Rhode Island *vs.* The State of Massachusetts.]

The pretensions of Massachusetts in favour of the line as established by both arbitrations, commenced in 1642; and no other jurisdiction had been, at any time, exercised over the country north of this line. It was claimed before Rhode Island had a political existence. The elements of which it was afterwards composed, were, at the time this right was first asserted, mingled with the parent colony of Massachusetts, and with other communities and nations. And after they became embodied and organized under the charter of 1663, it was nearly half a century before there seems to have been any dispute respecting this boundary.

Nearly two centuries have elapsed since the claim of Massachusetts to this line was set up, and more than a hundred and twenty years since the controversy was settled by the commissioners or arbitrators chosen by the parties; and, as averred in the plea, specially sanctioned and confirmed by Rhode Island.

Is time to have no influence in this case, on the agreements of the parties? It covers with its peaceful mantle stale disputes between individuals. And so strong is its influence, that fraud, which vitiates all human transactions, cannot be reached when covered by great lapse of time.

Has a treaty ever been set aside on the ground of mistake? Has it ever been contended, that after its ratification by the high contracting parties, either could look behind the treaty and object to it, because the negotiators had mistaken a fact? It is believed that such a pretension would be new in the history of diplomacy. The treaty must speak for itself; and under its provisions must the rights of the parties be ascertained.

In the first treaty of limits between this country and Great Britain; it is a fact not now questioned; that a mistake of many miles was made in establishing our northern boundary. But this has afforded to Great Britain no occasion of remonstrance or complaint.

Our own government, on a recent occasion, declined an acquiescence in the decision of the King of the Netherlands, in relation to this same boundary. But, in his letter of July 21st, 1832, to the representative of Great Britain in this country, the Secretary of State says, in relation to the resolution of the Senate against the decision; that it was adopted under the conviction that the arbiter had not decided the question submitted to him, or had decided it in a manner not authorized by the submission."

"It is not," he adds, "the intention of the undersigned to enter into an investigation of the argument which has led to this conclusion. The decision of the Senate precludes it, and the object of this communication renders it unnecessary; but it may be proper to add, that no question could have arisen as to the validity of the decision, had the sovereign arbiter determined on and designated any boundary as that which was intended by the treaty of 1783."

This view, by the Secretary, of the binding effect of the decision if it had been made on the point submitted to the arbiter, is in ac-

cordance with the principles of national law, and has a direct and most forcible application to the case under consideration.

No objection is made by Rhode Island that the arbitrators exceeded their powers. No such objection can be made. Their powers were ample; and their proceedings both in 1710, and in 1718, seem to have been characterized by great dignity and deliberation.

The complainant, it is true, was dissatisfied with the first decision, establishing Woodward and Saffrey's station; and by remonstrances induced the appointment of the second commission in 1717, which in the following year confirmed, in all respects, the first decision. Notwithstanding these remonstrances against the first decision, it would seem from the bill, that until 1749, the complainant believed that Woodward and Saffrey's station was only three English miles south of Charles river; and was consequently the true point from which the line should be run. This being the case, as the bill does not state the precise ground of dissatisfaction at the first report, it cannot well be imagined.

Rhode Island, it seems, from time to time, by remonstrances, in the form of resolutions and otherwise, and by the appointment of commissioners, signified its dissatisfaction at the boundary, as established in 1710 and 1718. Massachusetts, as it was bound in comity to do, listened to these expressions by Rhode Island; and more than once appointed commissioners on the subject. But whether we look to the averments in the plea, or to the statements in the bill, the defendant never seems to have done any thing which could impair the force of the agreements.

The bill states various facts, such as the little value of the land bounding on the disputed line for many years, the sparseness of the population, the want of means, and the intervention of war; as reasons why Rhode Island did not bring this controversy before the king in council, under the colonial government.

It appears from the exhibits accompanying the bill, that, in 1740, there being a dispute between Massachusetts and Rhode Island, whether the former could exercise its jurisdiction to the shores of the Narraganset bay, the King of Great Britain appointed commissioners to settle the controversy, who decided against Massachusetts. This decision was confirmed on an appeal from the commissioners, by the king and council.

So long as the colonial government continued, this mode of redress, so successfully invoked by the complainant in the above instance, remained open. The articles of confederation formed by the new government, made special provision for the settlement of disputed boundaries between states. And when these were revoked by the adoption of the Constitution, the tribunal at last appealed to was open; and has ever remained ready to hear and decide the controversy.

Giving full weight to all the allegations in the bill, which go to

excuse the delays of Rhode Island in asserting its claim, it is still difficult to say that the claim remains unaffected by the unmolested possession of Massachusetts, according to the agreements. Rhode Island, it is true, is small in territory, and weak in numerical force, but it has always stood high in moral power, and intellectual endowment; and the tribunals which, since the commencement of the controversy, have been open to hear its complaint, have been tribunals of reason, of justice, and of established law.

The arguments of the counsel for the complainant, zealous and able as they were, rested mainly on the hardship and injustice of deciding this controversy on the pleadings as they now stand. The mistake is admitted; and what is there else in the bill, taken in connection with all the facts and circumstances, which can give the case of the complainant a more imposing form. No fraud is imputed; the sealed agreements, now and ever, must speak the same language; the effect of time will remain; and the excuses alleged in the bill for delay, can scarcely have, under any form of pleading, greater effect than may be given to them as the case now stands. I speak not of the volume of evidence which may be thrown into the case by a change of the pleadings; but of the leading and indisputable facts which must, under any form of procedure, have a controlling influence in the decision. Believing, as I do, that in admitting the truth of the plea, Rhode Island has done nothing prejudicial to her interests; and that in the present attitude of the case, its substantial merits are before us, I feel bound to pronounce a different opinion from that which has been given by a majority of my brother judges. Taking the facts of the plea, and giving due weight to all the allegations of the bill, not denied by the plea, I am led to the conclusion that the bar is complete. In coming to this conclusion, I feel no want of respect for the state of Rhode Island, which has become so illustrious in our history by its enterprise, its intelligence, and its patriotism.

Mr. Justice CATRON.

The facts and pleadings have been so fully stated by my brethren, as to require from me only a brief notice of the conclusions my mind has come to on the points in controversy.

The defence, in the form of an incongruous plea, must set up matter in bar, which, if true, renders immaterial every other fact alleged in the bill; be these as they may, the defence must be conclusive of the controversy; and every necessary averment to sustain the matter pleaded in bar, must also be made in an answer covering the plea, which cannot be permitted to stand unsupported by an answer. This is the familiar and settled practice of the High Court of Chancery in England; and adopted by rule in the Courts of the United States.

In form, it is believed, the plea and answer in this cause are accurate in a high degree, in regard to the matter pleaded, and the

averments necessary to give it effect, in the sense it is relied on as a bar; unless the defence set up is double.

It is insisted the plea is multifarious, because it relies on two defences: first, the compacts; and second, the possession and occupation of the territory claimed by the plaintiff, for more than a century.

The facts pleaded must be conducive to a single point of defence; and the question is, are the compacts, the making of the line in part execution of them, and the taking and holding possession in other part, and complete execution of them, combined facts and circumstances, conducing to establish the single point relied on in defence? That is, that the line run from Woodward and Saffrey's station was the true boundary, established by, and marked in execution of, the compacts; and that by the compacts Rhode Island is estopped to deny its validity. And I think the circumstances pleaded are so connected as not to vitiate the plea.

If it is bad, it must therefore be so on its merits involving the obligatory force of the compacts. That they are prima facie conclusive of the boundary, is admitted: but the bill alleges they were made in mistake, and the line run and marked; and possession surrendered to Massachusetts, in mistake of a prominent fact: that Rhode Island then believed the station, and the line run from it, three miles south of Charles river; whereas subsequent observation and examination had ascertained it to be much further south, that is, about seven miles.

The Massachusetts charter calls for a line to be drawn east and west, " three miles south of the waters of said Charles river; or of any, or of every part thereof;" and the plea, in substance, avers, the charter was construed, and the line settled by the compacts, without misrepresentation on the part of Massachusetts; and with full and equal knowledge of all circumstances by both parties.

The plea having been set down for argument, without an issue, must for the present be taken as true; and the averments taken as admitted, that the parties entered into the compacts, and established the boundary, with full and equal knowledge of all the circumstances of law and fact involved in the controversy, as it then existed, and now exists. And in the face of the compacts thus made, can Rhode Island be heard to allege the existence of a mistake in the boundary established by them; and marked by the mutual commissioners, and as the joint act of both parties? Under the circumstances, to open the controversy, and let in proof of a mistake; at this day, to overthrow a solemn treaty made between two independent governments; is deemed by me, inadmissible, not to say dangerous. And I think the matters pleaded (if true) a good defence. If this compromise and solemn establishment of a boundary, made a century ago, can be impeached on the ground of a mistake, so palpable and easy of detection; cannot every other made by the states be brought before this Court, on a similar assumption, usually much better founded; especially where degrees of latitude

are called for as boundaries? If the parties, " with full and equal knowledge of all circumstances," compromised and settled a doubtful construction of the Massachusetts charter, and in which they were engaged nearly ten years; why should this Court go further into the matter, at the hazard of encouraging litigation in so many other quarters?

I will for the present refrain from entering into the inquiry, how far such a mistake of law, in construing a private instrument, could be inquired into by a Court of Chancery in a suit between man and man; nor what help the mistake of law (if any exists) could derive from the facts apparent by the bill, unless the statement of the proposition should suggest the answer.

Nor will I attempt to draw the marked line of distinction between such private agreement, and a public treaty, by state with state; in regard to the difficulty of going into matters of mistake, usually not predicable of a treaty.

On consideration of the plea filed in this case by the defendant, and of the arguments of counsel thereupon had, as well in support of as against the said plea, it is now here ordered by this Court, that the said plea be, and the same is hereby overruled; and it is further now here ordered by this Court, that the defendant answer the bill of complaint, as amended, on or before the first day of the next term.